**Warren McCLESKEY, Petitioner,**

v.

**Walter D. ZANT, Respondent.**

**Civ. A. No. C81-2434A.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Feb. 1, 1984.

---

Robert H. Stroup, Atlanta, Ga., Jack Greenberg, John Charles Boger, New York City, Timothy K. Ford, Seattle, Wash., Anthony G. Amsterdam, N.Y. University Law School, New York City, for petitioner.

Michael J. Bowers, Atty. Gen., Mary Beth Westmoreland, Asst. Atty. Gen., Atlanta, Ga., for respondent.

## ORDER OF THE COURT

FORRESTER, District Judge.

Petitioner Warren McCleskey was convicted of two counts of armed robbery and one count of malice murder in the Superior Court of Fulton County on October 12, 1978. The court sentenced McCleskey to death on the murder charge and to consecutive life sentences, to run after the death sentence, on the two armed robbery charges. On automatic appeal to the Supreme Court of Georgia the convictions and the sentences were affirmed. *McClesky v. State,* 245 Ga. 108, 263 S.E.2d 146 (1980). The Supreme Court of the United States denied McCleskey's petition for a writ of certiorari. *McClesky v. Georgia,* 449 U.S. 891, 101 S.Ct. 253, 66 L.Ed.2d 119 (1980). On December 19, 1980 petitioner filed an extraordinary motion for a new trial in the Superior Court of Fulton County. No hearing has ever been held on this motion.

Petitioner then filed a petition for writ of habeas corpus in the Superior Court of Butts County. After an evidentiary hearing the Superior Court denied all relief sought. *McCleskey v. Zant*, No. 4909 (Sup.Ct. of Butts County, April 8, 1981). On June 17, 1981 the Supreme Court of Georgia denied petitioner's application for a certificate of probable cause to appeal the decision of the Superior Court of Butts County. The Supreme Court of the United States denied certiorari on November 30, 1981. *McCleskey v. Zant*, 454 U.S. 1093, 102 S.Ct. 659, 70 L.Ed.2d 631 (1981).

Petitioner then filed this petition for writ of habeas corpus on December 30, 1981. He asserts 18 separate grounds for granting the writ. Some of these grounds assert alleged violations of his constitutional rights during his trial and sentencing. Others attack the constitutionality of Georgia's death penalty. Because petitioner claimed to have sophisticated statistical evidence to demonstrate that racial discrimination is a factor in Georgia's capital sentencing process, this court held an extensive evidentiary hearing to examine the merits of these claims. The court's discussion of the statistical studies and their legal significance is in Part II of this opinion. Petitioner's remaining contentions are discussed in Parts III through XVI. The court has concluded that petitioner is entitled to relief on only one of his grounds, his claim that the prosecution failed to reveal the existence of a promise of assistance made to a key witness. Petitioner's remaining contentions are without merit.

## I. DETAILS OF THE OFFENSE.

On the morning of May 13, 1978 petitioner and Ben Wright, Bernard Dupree, and David Burney decided to rob a jewelry store in Marietta, Georgia. However, after Ben Wright went into the store to check it out, they decided not to rob it. The four then rode around Marietta looking for another suitable target. They eventually decided to rob the Dixie Furniture Store in Atlanta. Each of the four was armed. The evidence showed that McCleskey carried a shiny nickel-plated revolver matching the description of a .38 caliber Rossi revolver stolen in an armed robbery of a grocery store a month previously. Ben Wright carried a sawed-off shotgun, and the other two carried pistols. McCleskey went into the store to see how many people were present. He walked around the store looking at furniture and talking with one of the sales clerks who quickly concluded that he was not really interested in buying anything. After counting the people in the store, petitioner returned to the car and the four men planned the robbery. Executing the plan, petitioner entered the front of the store while the other three entered the rear by the loading dock. Petitioner secured the front of the store by rounding up the people and forcing them to lie face down on the floor. The others rounded up the employees in the rear and began to tie them up with tape. The manager was forced at gunpoint to turn over the store receipts, his watch, and $6.00. Before the robbery could be completed, Officer Frank Schlatt, answering a silent alarm, pulled his patrol car up in front of the building. He entered the front door and proceeded down the center aisle until he was almost in the middle of the store. Two shots then rang out, and Officer Schlatt collapsed, shot once in the face and once in the chest. The bullet that struck Officer Schlatt in the chest ricocheted off a pocket lighter and lodged in a nearby sofa. That bullet was recovered and subsequently determined to have been fired from a .38 caliber Rossi revolver. The head wound was fatal. The robbers all fled. Several weeks later petitioner was arrested in Cobb County in connection with another armed robbery. He was turned over to the Atlanta police and gave them a statement confessing participation in the Dixie Furniture Store robbery but denying the shooting.

Although the murder weapon was never recovered, evidence was introduced at trial that petitioner had stolen a .38 caliber Rossi in an earlier armed robbery. The State also produced evidence at trial that tended to show that the shots were fired from the front of the store and that petitioner was

the only one of the four robbers in the front of the store. The State also introduced over petitioner's objections the statements petitioner had made to Atlanta police. Finally, the State produced testimony by one of the co-defendants and by an inmate at the Fulton County Jail that petitioner had admitted shooting Officer Schlatt and had even boasted of it. In his defense petitioner offered only an unsubstantiated alibi defense.

The jury convicted petitioner of malice murder and two counts of armed robbery. Under Georgia's bifurcated capital sentencing procedure, the jury then heard arguments as to the appropriate sentence. Petitioner offered no mitigating evidence. After deliberating the jury found two statutory aggravating circumstances—that the murder had been committed during the course of another capital felony, an armed robbery; and that the murder had been committed upon a peace officer engaged in the performance of his duties. The jury sentenced the petitioner to death on the murder charge and consecutive life sentences on the armed robbery charges.

## II. THE CONSTITUTIONALITY OF THE GEORGIA DEATH PENALTY.

### A. An Analytical Framework of the Law.

Petitioner contends that the Georgia death penalty statute is being applied arbitrarily and capriciously in violation of the Eighth and Fourteenth Amendments to the United States Constitution. He concedes at this level that the Eighth Amendment issue has been resolved adversely to him in this circuit. As a result, the petitioner wishes this court to hold that the application of a state death statute that permits the imposition of capital punishment to be based on factors of race of the defendant or race of the victim violates the equal protection clause of the Fourteenth Amendment.

■ It is clear beyond peradventure that the application of a statute, neutral on its face, unevenly applied against minorities, is a violation of the equal protection clause of the Fourteenth Amendment. *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). The more difficult question presented is why under the facts of this case the petitioner would be denied equal protection of the law if he is sentenced to death because of the race of his victim. This quandry has led the Eighth Circuit to find that a petitioner has no standing to raise this claim as a basis for invalidating his sentence. *Britton v. Rogers*, 631 F.2d 572, 577 n. 3 (8th Cir.1980), *cert. denied*, 451 U.S. 939, 101 S.Ct. 2021, 68 L.Ed.2d 327 (1981).

While this circuit in *Spinkellink v. Wainwright*, 578 F.2d 582 (5th Cir.1978), *reh'g denied*, 441 U.S. 937, 99 S.Ct. 2064, 60 L.Ed.2d 667, *application for stay denied*, 442 U.S. 1301, 99 S.Ct. 2091, 60 L.Ed.2d 649 (1979), seemed to give lip service to this same point of view by approving the proposition that a district court "must conclude that the focus of any inquiry into the application of the death penalty must necessarily be limited to the persons who receive it rather than their victims," *id.* at 614 n. 39, the court in *Spinkellink* also adopted the position that a petitioner such as McCleskey would have standing to sue in an equal protection context:

> Spinkellink [petitioner] has standing to raise the equal protection issue, even though he is not a member of the class allegedly discriminated against, because such discrimination, if proven, impinges on his constitutional right under the Eighth and Fourteenth Amendments not to be subjected to cruel and unusual punishment. *See Taylor v. Louisiana, supra*, 419 U.S. [522] at 526 [95 S.Ct. 692 at 695, 42 L.Ed.2d 690].

*Id.* at 612 n. 36. This footnote in *Spinkellink* warrants close examination. In *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), the Supreme Court held that a male had standing to challenge a state statute providing that a woman should not be selected for jury ser-

vice unless she had previously filed a written declaration of her desire to be subject to jury service. The Court in *Taylor* cited to *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), to conclude: "Taylor, in the case before us, was similarly entitled to tender and have adjudicated the claim that the exclusion of women from jury service deprived him of the kind of factfinder to which he was constitutionally entitled." *Id.* at 526, 95 S.Ct. at 696. In *Peters* the Supreme Court rejected the contention that because a petitioner is not black, he has not suffered any unconstitutional discrimination. The rejection of the argument, however, was based *not* on equal protection grounds, but upon due process grounds. *See* 407 U.S. at 496–97, 497 n. 5, 501, 504, 92 S.Ct. at 2165–66 n. 5 2168, 2169; *id.* at 509, 92 S.Ct. at 2171 (Burger, C.J., dissenting).

Thus, for *Spinkellink* to articulate an equal protection standing predicate based upon Sixth Amendment and due process cases can be characterized, at best, as curious. Furthermore, not only does it appear that case law in this circuit subsequent to *Spinkellink* assumes that a contention similar to that advanced by petitioner here is cognizable under equal protection, *see, e.g., Adams v. Wainwright,* 709 F.2d 1443, 1449–50 (11th Cir.), *reh'g en banc denied,* 716 F.2d 914 (11th Cir.1983); *Smith v. Balkcom,* 671 F.2d 858 (5th Cir.1982) (Unit B); but it appears that this circuit is applying equal protection standards to Eighth Amendment challenges of the death penalty. *See, e.g., Adams v. Wainwright, supra. Accord, Harris v. Pulley,* 692 F.2d 1189, 1197–98 (9th Cir.1982), *reversed and remanded on other grounds,* — U.S. —, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Indeed, in *Spinkellink* itself, the court adopted an analytical nexus between a cruel and unusual punishment contention and a Fourteenth Amendment equal protection evidentiary showing:

> [T]his is not to say that federal courts should never concern themselves on federal habeas corpus review with whether Section 921.141 [Florida's death penalty statute] is being applied in a racially discriminatory fashion. If a petitioner can show some specific act or acts evidencing intentional or purposeful racial discrimination against him, *see Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252 [97 S.Ct. 555, 50 L.Ed.2d 450] (1977), either because of his own race or the race of his victim, the federal district court should intervene and review substantively the sentencing decision.

*Spinkellink,* 578 F.2d at 614 n. 40.

■ Principles of *stare decisis,* of course, mandate the conclusion that petitioner has standing to bring forth his claim. Furthermore, under *stare decisis,* this court must strictly follow the strictures of *Spinkellink* and its progeny as to standards of an evidentiary showing required by this petitioner to advance successfully his claim.

■ Were this court writing on a clean slate, it would hold that McCleskey would have standing under the due process clause of the Fourteenth Amendment, but not under the equal protection clause or the Eighth Amendment, to challenge his conviction and sentenced if he could show that they were imposed on him on account of the race of his victim. From a study of equal protection jurisprudence, it becomes apparent that the norms that underlie equal protection involve two values: (i) the right to equal treatment is inherently good; and (ii) the right to treatment as an equal is inherently good. *See* L. Tribe, *American Constitutional Law,* § 16–1, at 992–93 (1978). In this case, however, the evidence shows that the petitioner is being treated as any member of the majority would, or that petitioner's immutable characteristics have no bearing on his being treated differently from any member of the majority. Thus, with reference to his argument that he is being discriminated against on the basis of the race of his victim, equal protection interests are not being implicated.

■ Petitioner also fails to state a claim under the Eighth Amendment. It is clear from the decisions of the Supreme

Court that the death penalty is not *per se* cruel and unusual in violation of the Eighth Amendment. Prior to *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the cruel and unusual punishments clause was interpreted as applicable to contentions that a punishment involved unnecessary pain and suffering, that it was so unique as not to serve a humane purpose, or so excessive as not to serve a valid legislative purpose. *See Furman,* 408 U.S. at 330–33, 92 S.Ct. at 2772–74 (Marshall, J., concurring). In other words, Eighth Amendment jurisprudence prior to *Furman* entailed an inquiry into the nexus between the offense and punishment; that punishment which was found to be excessive was deemed to violate Eighth Amendment concerns. The Supreme Court has determined as a matter of law that where certain aggravating features are present the infliction of the death penalty is not violative of the Eighth Amendment. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In the instant case, petitioner's race of the victim argument does not address traditional Eighth Amendment concerns. His argument does not entail—nor could he seriously advance—any contention that his penalty is disproportionate to his offense, that his penalty constitutes cruel and unusual punishment, or that his penalty fails to serve any valid legislative interest.

What petitioner does contend is that the Georgia system allows for an impermissible value judgment by the actors within the system—that white life is more valuable than black life—and, as a practical matter, that the Georgia system allows for a double standard for sentencing. Certainly, such allegations raise life and liberty interests of the petitioner. Furthermore, such allegations speak not to the rationality of the process but to the values inherent in the process. In other words, it is the integrity, propriety, or "fairness" of the process that is being questioned by petitioner's contention, and not the mechanics or structure of the process. Thus, petitioner's allegation of an impermissible process speaks most fundamentally to Fourteenth Amendment due process interests, rather than Eighth Amendment interests that traditionally dealt with "cruel and unusual" contexts.

For all its consequences, "due process" has never been, and perhaps can never be, precisely defined. "[U]nlike some legal rules," this Court has said, due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895 [81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230]. Rather, the phrase expresses the requirement of "fundamental fairness," a requirement whose meaning can be as opaque as its importance is lofty. Applying the Due Process Clause is therefore an uncertain enterprise which must discover what "fundamental fairness" consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake.

*Lassiter v. Department of Social Services,* 452 U.S. 18, 24–25, 101 S.Ct. 2153, 2158–2159, 68 L.Ed.2d 640 (1981). It is clear that due process of law within the meaning of the Fourteenth Amendment mandates that the laws operate on all alike such that an individual is not subject to an arbitrary exercise of governmental power. *See, e.g., Leeper v. Texas,* 139 U.S. 462, 467–68, 11 S.Ct. 577, 579–80, 35 L.Ed. 225 (1891); *Hurtado v. California,* 110 U.S. 516, 535–36, 4 S.Ct. 111, 120–21, 28 L.Ed. 232 (1884). As Justice Frankfurter observed in *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (footnote omitted):

Regard for the requirements of the Due Process Clause "inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings [resulting in a conviction] in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." *Malinski v. New York, supra,* [324 U.S. 401] at 416–17 [65 S.Ct. 781 at

789, 89 L.Ed. 1029]. The standards of justice are not authoritatively formulated anywhere as though they were specifics. Due process of law is a summarized constitutional guarantee of respect for those personal immunities which, as Mr. Justice Cardozo twice wrote for the Court, are "so rooted in the traditions and conscience of our people as to be ranked as fundamental," *Snyder v. Massachusetts*, 291 U.S. 97, 105 [54 S.Ct. 330, 332, 78 L.Ed. 674], or are "implicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 325 [58 S.Ct. 149, 152, 82 L.Ed. 288].

*See also Peters v. Kiff*, 407 U.S. 493, 501, 92 S.Ct. 2163, 2168, 33 L.Ed.2d 83 (1972) ("A fair trial in a fair tribunal is a basic requirement of due process.") (citing *In Re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955)). *See generally*, L. Tribe, *supra*, § 10–7, at 501–06.

In summary, the court concludes that the petitioner's allegation with respect to race of the victim more properly states a claim under the due process clause of the Fourteenth Amendment. The allegation is that the death penalty was imposed for a reason beyond that consented to by the governed and because of a value judgment which, though rational, is morally impermissible in our society. As such, McCleskey could fairly claim that he was being denied his life without due process of law. Although he couches his claims in terms of "arbitrary and capricious," he is, to the contrary, contending not that the death penalty was imposed in his case arbitrarily or capriciously but on account of an intentional application of an impermissible criterion. As the Supreme Court predicted in *Gregg* and as petitioner's evidence shows, the Georgia death penalty system is far from arbitrary or capricious.

This court is not, however, writing on a clean slate. Instead, it is obliged to follow the interpretations of its circuit on such claims. As noted earlier *Yick Wo* gives McCleskey standing to attack his sentence on the basis that it was imposed on him because of his race and *Spinkellink* gives

him standing under the equal protection clause to attack his sentence because it was imposed because of the race of his victim. McCleskey is entitled to the grant of a writ of habeas corpus if he establishes that he was singled out for the imposition of the death penalty by some specific act or acts evidencing an intent to discriminate against him on account of his race or the race of his victim. *Smith v. Balkcom*, 660 F.2d 573 (5th Cir. Unit B 1981), *modified in part*, 671 F.2d 858 (1982); *Spinkellink, supra.* In *Stephens v. Kemp*, — U.S. —, 104 S.Ct. 562, 78 L.Ed.2d 370 (1983), Justice Powell, in a dissent joined in by the Chief Justice and Justices Rehnquist and O'Connor, made the following statement with reference to the Baldus study:

> Although characterized by the judges of the court of appeals who dissented from the denial of the hearing en banc as a "particularized statistical study" claimed to show "intentional race discrimination," no one has suggested that the study focused on this case. A "particularized" showing would require—as I understand it—that there was intentional race discrimination in indicting, trying and convicting Stephens and presumably in the state appellate and state collateral review that several times follows the trial.

*Id.* 104 S.Ct. at 564 n. 2 (Powell, J. dissenting).

The intentional discrimination which the law requires cannot generally be shown by statistics alone. *Spencer v. Zant*, 715 F.2d 1562, 1581 (11th Cir.1983), *reh'g en banc granted*, 715 F.2d 1583 (11th Cir.1983). Disparate impact alone is insufficient to establish a violation of the Fourteenth Amendment unless the evidence of disparate impact is so strong that the only permissible inference is one of intentional discrimination. *Sullivan v. Wainwright*, 721 F.2d 316 (11th Cir.1983); *Adams v. Wainwright*, 709 F.2d 1443 (11th Cir.1983); *Smith v. Balkcom*, 671 F.2d 858, 859 (5th Cir. Unit B), *cert. denied*, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982).

B. An Analytical Framework of Petitioner's Statistical Evidence.

The petitioner does rely upon statistical evidence to support his contentions respecting the operation of racial discrimination on a statewide basis. He relies on statistical and anecdotal evidence to support his contentions that racial factors play a part in the application of the death penalty in Fulton County where he was sentenced.

Statistical evidence, of course, is nothing but a form of circumstantial evidence. Furthermore, it is said "that statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." *Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 1857, 52 L.Ed.2d 396 (1977).

■ As courts have dealt with statistics in greater frequency, a body of common law has developed a set of statistical conventions which must be honored before statistics will be admitted into evidence at all or before they are given much weight. These common law statistical conventions prevail even over the conventions generally accepted in the growing community of economotricians. The first convention which has universally been honored in death penalty cases is that any statistical analysis must reasonably account for racially neutral variables which could have produced the effect observed. *See Smith v. Balkcom, supra; Spinkellink v. Wainwright*, 578 F.2d 582, 612–16 (5th Cir.1978), *cert. denied*, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979); *McCorquodale v. Balkcom*, 705 F.2d 1553, 1556 (11th Cir.1983).

■ The second convention which applies in challenges brought under the equal protection clause is that the statistical evidence must show the likelihood of discriminatory treatment by the decision-makers who made the judgments in question. *Adams v. Wainwright, supra; Maxwell v. Bishop*, 398 F.2d 138 (8th Cir.1968) (Blackmun, J.), *vacated on other grounds*, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970).

■ The third general statistical convention is that the underlying data must be shown to be accurate. The fourth is that the results should be statistically significant. Generally, a statistical showing is considered significant if its "P" value is .05 or less, indicating that the probability that the result could have occurred by chance is 1 in 20 or less. Said another way, the observed outcome should exceed the standard error estimate by a factor of 2. *Eastland v. TVA*, 704 F.2d 613, 622 n. 12 (11th Cir.1983).

■ McCleskey relies primarily on a statistical technique known as multiple regression analysis to produce the statistical evidence offered in support of his contentions. This technique is relatively new to the law. This court has been able to locate only six appellate decisions where a party to the litigation relied upon multiple regression analysis. In two of them, the party relying on the analysis prevailed, but in both cases their showings were supported by substantial anecdotal evidence. *E.g., Wade v. Mississippi Cooperative Extension Service*, 528 F.2d 508 (5th Cir.1976). In four of them, the party relying upon the technique was found to have failed in his attempt to prove something through a reliance on it. Generally, the failure came when the party relying upon multiple regression analysis failed to honor conventions which the courts insisted upon. Before a court will find that something is established based on multiple regression analysis, it must first be shown that the model includes all of the major variables likely to have an effect on the dependent variable. Second, it must be shown that the unaccounted-for effects are randomly distributed throughout the universe and are not correlated with the independent variables included. *Eastland, supra*, at 704.

■ In multiple regression analysis one builds a theoretical statistical model of reality and then attempts to control for all

possible independent variables while measuring the effect of the variable of interest upon the dependent variable. Thus, a properly done study begins with a decent theoretical idea of what variables are likely to be important. Said another way, the model must be built by someone who has some idea of how the decision-making process under challenge functions. Three kinds of evidence may be introduced to validate a regression model: (1) Direct testimony as to what factors are considered, (2) what kinds of factors generally operate in a decision-making process like that under challenge, and (3) expert testimony concerning what factors can be expected to influence the process under challenge. *Eastland, supra,* at 623 (quoting Baldus and Cole, *Statistical Proof of Discrimination* ).

Other cases have established other conventions for the use of multiple regression analysis. It will be rejected as a tool if it does not show the effect on people similarly situated; across-the-board disparities prove nothing. *EEOC v. Federal Reserve Bank of Richmond,* 698 F.2d 633, 656–58 (4th Cir.1983), *appeal pending; Valentino v. U.S. Postal Service,* 674 F.2d 56, 70 (D.C.Cir.1982). A regression model that ignores information central to understanding the causal relationships at issue is insufficient to raise an inference of discrimination. *Valentino, supra,* at 71. Finally, the validity of the model depends upon a showing that it predicts the variations in the dependent variable to some substantial degree. A model which explains only 52 or 53% of the variation is not very reliable. *Wilkins v. University of Houston,* 654 F.2d 388, 405 (5th Cir.1981), *cert. denied,* 459 U.S. 822, 103 S.Ct. 51, 74 L.Ed.2d 57 (1982).

"To sum up, statistical evidence is circumstantial in character and its acceptability depends upon the magnitude of the disparity it reflects, the relevance of its supporting data, and other circumstances in the case supportive of or in rebuttal of a hypothesis of discrimination." *EEOC v. Federal Reserve Bank of Richmond, supra,* at 646–47. Where a gross statistical disparity can be shown, that alone may constitute a prima facie case of discrimination. This has become the analytical framework in cases brought under Title VII of the Civil Rights Act of 1964. Because Fourteenth Amendment cases have a similar framework and because there are relatively few such cases relying on statistics, when appropriate the court may draw upon Title VII cases. *Jean v. Nelson,* 711 F.2d 1455, 1486 n. 30 (11th Cir.), *reh'g en banc granted,* 714 F.2d 96 (1983).

Generally it is said that once the plaintiff has put on a prima facie statistical case, the burden shifts to the defendant to go forward with evidence showing either the existence of a legitimate non-discriminatory explanation for its actions or that the plaintiff's statistical proof is unacceptable. *Johnson v. Uncle Ben's, Inc.,* 628 F.2d 419 (5th Cir.1980), *cert. denied,* 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982). The statistics relied upon by the plaintiff to establish a prima facie case can form the basis of the defendant's rebuttal case when, for example, the defendant shows that the numerical analysis is not the product of good statistical methodology. *EEOC v. Datapoint Corp.,* 570 F.2d 1264 (5th Cir.1978). Said another way, a prima facie case is not established until the plaintiff has demonstrated both that the data base is sufficiently accurate and that the regression model has been properly constructed. Otherwise, the evidence would be insufficient to survive a motion for directed verdict, and this is the *sine qua non* of a prima facie case. *Jean, supra,* at 1487. Statistics produced on a weak theoretical foundation are insufficient to establish a prima facie case. *Eastland, supra,* at 625.

Once a prima facie case is established the burden of production is shifted to the respondent. If it has not already become apparent from the plaintiff's presentation, it then becomes the defendant's burden to demonstrate that the plaintiff's statistics are misleading, and such rebuttal may not be made by speculative theories. *See Eastland, supra,* at 618; *Coble v. Hot*

*Springs School District,* 682 F.2d 721, 730–31 (8th Cir.1982); *Jean v. Nelson, supra.*

### C. Findings of Fact.

The court held an evidentiary hearing for the purpose of enabling the petitioner to put on the evidence he had in support of his contention that racial factors are a consideration in the imposition of the death penalty.[1] Hereafter are the court's findings as to what was established within the context of the legal framework set out above.

### 1. *The Witnesses*

The principal witness called by the petitioner was Professor David C. Baldus. Professor Baldus is a 48-year-old Professor of Law at the University of Iowa. Presently he is on leave from that post and is serving on the faculty of the University of Syracuse. Baldus's principal expertise is in the use of statistical evidence in law. He and a statistician, James Cole, authored a book entitled *Statistical Proof of Discrimination* that was published by McGraw-Hill in 1980. R 54–56. He has done several pieces of social science research involving legal issues and statistical proof. R 45–46, 53.

Before he became involved in projects akin to that under analysis here, Baldus apparently had had little contact with the criminal justice system. In law school he took one course which focused heavily on the rationale of the law of homicide. R 39. During his short stint in private practice he handled some habeas corpus matters and had discussions with a friend who was an Assistant District Attorney concerning the kinds of factors which his friend utilized in deciding how to dispose of cases. R 43–44. As a part of the preparation of statistical proof of discrimination, Baldus and his co-author, Cole, re-evaluated the data set relied upon in *Maxwell v. Bishop,* 398 F.2d 138 (8th Cir.1968), *vacated on other grounds,* 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970), a rape case. R 72.

Baldus became interested in methods of proportionality review and, together with four other scholars, published findings in the Stanford Law Review and the Journal of Criminal Law and Criminology. R 89. This was done on the basis of an analysis of some capital punishment data from California. R 81, *et seq.* Thereafter Baldus became a consultant to the National Center for State Courts and to the Supreme Court of South Dakota and the Supreme Court of Delaware. It is understood that his consulting work involved proportionality review. R 95. Baldus and Cole have also prepared an article for the Yale Law Journal evaluating statistical studies of the death penalty to determine if it had a deterrent effect. R 78. At the University of Iowa Baldus taught courses on scientific evidence, discrimination law, and capital punishment.

Baldus was qualified by the court as an expert on the legal and social interpretation of data, not on the issue of whether or not the statistical procedures were valid under the circumstances. While Baldus has some familiarity with statistical methodology, he was quick to defer to statistical experts where sophisticated questions of methodology were posed. *See generally* R 109–20.

Dr. George Woodworth was called by the petitioner and qualified as an expert in the theory and application of statistics and statistical computation, especially with reference to analysis of discreet outcome data. Dr. Woodworth is an Associate Professor of Statistics at the University of Iowa and collaborated with Baldus on the preparation of the study before the court. R 1193.

The petitioner also called Dr. Richard A. Berk, a Professor of Sociology at the University of California at Santa Barbara, and he was qualified as an expert in social science research with particular emphasis on the criminal justice system. R 1749–53.

---

**1.** A separate one-day hearing was had several months after the original hearing. The transcript of those proceedings appears in Volume X of the transcript, and that testimony will hereafter be referred to with the prefix "X."

The respondents called two experts. One was Dr. Joseph Katz, an Assistant Professor at Georgia State University in the Department of Quantitative Methods. He was qualified as an expert in analyzing data, in research design, in statistics, statistical analysis and quantitative methods. R 1346. Dr. Katz is a rather recent graduate of Louisiana State University. The respondent also called Roger L. Burford, a Professor of Quantitative Business Analysis at LSU. He was Katz's mentor at the graduate level. Burford was qualified as a statistical expert. R 1627–32.

*The court was impressed with the learning of all of the experts. Each preferred the findings and assumptions which supported his thesis, but it seemed to the court that no one of them was willing to disregard academic honesty to the extent of advancing a proposition for which there was absolutely no support.*

### 2. Scope of the Studies

Baldus and Woodworth conducted two studies on the criminal justice system in Georgia as it deals with homicide and murder cases. The first is referred to as the Procedural Reform Study. The second is referred to as the Charging and Sentencing Study. R 121–122.

The universe for the Procedural Reform Study included all persons convicted of murder at a guilt trial. Also included were several offenders who pled guilty to murder and received the death penalty. The time period for the study included offenders who were convicted under the new Georgia death penalty statute which went into effect on March 28, 1973, and included all such offenders who had been arrested as of June 30, 1978. In the Procedural Reform Study no sample of the cases was taken and instead the entire universe was studied. R 170–71. The data sources used by the researchers in the Procedural Reform Study were the files of the Georgia Supreme Court, certain information from the Department of Offender Rehabilitation, and information from the Georgia Department of Vital Statistics. R 175, *et seq.*

Except for the few pleas, the Procedural Reform Study focused only on offenders who had been convicted of murder at a trial. R 122. There were approximately 550 cases in the universe for the Procedural Reform Study.

The Procedural Reform Study began when Baldus developed a questionnaire and dispatched two students to Georgia in the fall of 1979. In 1980 the coders returned to Georgia and coded 264 cases on site. R 241–43, DB 28, DB 28A. As two different questionnaires were used, the researchers wrote a computer program which translated the data gathered from both questionnaires into one format. R 246.

Baldus made some preliminary studies on the data that he gathered in the Procedural Reform Study. He found in these preliminary analyses no "race of the defendant" effect and a very unclear "race of the victim" effect. R 258. The Legal Defense Fund learned of Baldus's research and retained him to conduct the second study. R 256. Baldus was of the opinion that it was critical to the validity of the study that the strength of the evidence be measured. R 262. Also, he felt it important to examine the combined effects of all the decisions made at the different levels of the criminal justice system. R 147. Accordingly, the design of the Charging and Sentencing Study was different in that it produced measurements in these two respects in addition to measuring factors akin to those which were already being taken into account in the Procedural Reform Study.

The universe for the Charging and Sentencing Study was all offenders who were convicted of murder or voluntary manslaughter whose crimes occurred after March 28, 1973 and whose arrests occurred before December 21, 1978. This produced a universe of about 2500 defendants. R 123, 263–64. Any defendant who was acquitted or convicted of a lesser-included offense is not included in the study. R 264.

From the universe of the Charging and Sentencing Study a random stratified sample was drawn. The first stratification was

by outcome. The researchers drew a 25% random sample of murder cases with life sentences and a 25% random sample of voluntary manslaughter cases. R 1216. To this sample, all death penalty cases were added. R 267–69. The second stratification was geographic. The researchers drew a sample of 18 cases from each judicial circuit in Georgia. Where the circuit did not produce 18 cases in the first draw, additional cases were drawn from the population to supplement the original random sample. The results from each judicial circuit were then weighted so that each circuit contributed to the total effect in proportion to the total number of cases it contributed to the universe. R 270.

*Because of the many factors involved in such an analysis, a simple binomial comparison would show nothing. To determine whether or not race was being considered, it is necessary to compare very similar cases. This suggests the use of a statistical technique known as cross tabulation. Because of the data available, it was impossible to get any statistically significant results in comparing exact cases using a cross tabulation method. R 705. Accordingly, the study principally relies upon multivariate analysis.*

### 3. *The Accuracy of the Data Base*

As will be noted hereafter, no statistical analysis, much less a multivariate analysis, is any better than the accuracy of the data base. That accuracy was the subject of much testimony during the hearing. To understand the issue it is necessary to examine the nature of the questionnaires utilized and the procedures employed to enter the data upon the questionnaires.

The original questionnaire for the Procedural Reform Study was approximately 120 pages long and had foils (blanks) for the entry of data on about 500 variables. DB 27. The first 14 pages of the questionnaire were filled out by the Georgia Department of Offender Rehabilitation for Professor Baldus. The remainder of the pages were coded by students in Iowa based on ex-

tracts prepared by data gatherers in Georgia.

The data on the first 15 pages of the Procedural Reform Study questionnaire includes information on sentencing, basic demographic data concerning the defendant, his physical and psychiatric condition, his IQ, his prior record, as well as information concerning his behavior as an inmate. The next six pages of the questionnaire contained inquiries concerning the method of killing. Data is also gathered on the number of victims killed, information about co-perpetrators, and the disposition of their cases, and pleadings by the defendant. Another eight pages of questions search out characteristics of the offense. Three pages are reserved for data on contemporaneous offenses, and another three pages for the victim's role in the crime and the defendant's behavior after the homicide. There are additional pages on the role of co-perpetrators. There are more questions relating to the defense at trial and on the kinds of evidence submitted by the defendant. Then, there are 26 pages of questions concerning the deliberations of the jury and information concerning the penalty trial. The questionnaire concludes on matters relating to the disposition of the case with respect to other counts charged and, finally, the last page is reserved for the coder to provide a narrative summary of what occurred in the case. R 197–200, DB 27. This questionnaire also contained foils so that the coder could indicate whether or not the prosecutor or the jury was aware of the information being coded.

It is important to reiterate that this questionnaire was not coded by students having access to the raw data in Georgia. Instead, as noted above, two law students prepared detailed abstracts of each case. Their notes were dictated and transcribed. These notes, together with an abstract filled out by an administrative aide to the Georgia Supreme Court and the opinion of the Georgia Supreme Court, were assembled as a file and were available in Iowa to the coders. R 209, 212, 241.

During the 1979–80 academic year, another questionnaire, simpler in form, was designed for use in obtaining data for the Procedural Reform Study. This questionnaire dropped the inquiries concerning whether the sentencing jury was aware of the aggravating and mitigating factors appearing in the files. R 230–31. Some of the questionnaires were coded in Georgia and some were coded in Iowa. Baldus developed a coding protocol in an effort to guide those who were entering data on the questionnaires. R 220–21, 227. The professional staff at the University of Iowa Computer Center entered the data obtained from the various Procedural Reform Study questionnaires into the computer.

Yet another questionnaire was designed for the Charging and Sentencing Study. The last questionnaire was modified in three respects. First, Baldus included additional queries concerning legitimate aggravating and mitigating factors because he had determined on the basis of his experience with earlier data that it was necessary to do so. Second, the questionnaire expanded the coverage of materials relating to prior record. Third, it contained a significant section on "strength of the evidence." R 274–77. After the new draft was produced and reviewed by several other academicians, it was reviewed by attorneys with the Legal Defense Fund. They suggested the addition of at least one other variable. R 275.

The Charging and Sentencing Study questionnaire is 42 pages long and has 595 foils for the recordation of factors which might, in Baldus's opinion, affect the outcome of the case. Generally, the kind of information sought included the location of the offense, the details of all of the charges brought against the offender, the outcome of the case, whether or not there was a plea bargain, characteristics of the defendant, prior record of the defendant, information regarding contemporaneous offenses, details concerning every victim in the case, characteristics of the offense, statutory aggravating factors, a delineation of the defendant's role vis-a-vis co-perpetrators', information on outcome of co-perpetrators'

cases, other aggravating circumstances such as the number of shots fired, miscellaneous mitigating circumstances relating to the defendant or the victim, the defendant's defenses at the guilt trial, and the strength of the evidence. R 280–86. Again, all of these were categories of information which Baldus believed could affect the outcome of a given case.

A student who headed a portion of the data-gathering effort for the first study was placed in charge of five law students who were hired and trained to code the new questionnaires. R 308. This supervisor's name was Ed Gates.

The principal data source for the Charging and Sentencing study was records of the Georgia Department of Pardons and Paroles. This was supplemented with information from the Bureau of Vital Statistics and questionnaires returned from lawyers and prosecutors. Also, some information was taken from the Department of Offender Rehabilitation. R 293–94, DB 39. The records from the Department of Pardons and Paroles included a summary of the police investigative report prepared by a parole officer, an FBI rap sheet, a personal history evaluation, an admissions data summary sheet, and, on occasion, the file might contain a witness statement or the actual police report. R 347. The police report actually appeared in about 25% of the cases. R 348. The Pardons and Paroles Board investigative summaries were always done after conviction.

Baldus and Gates again developed a written protocol in an attempt to assist coders in resolving ambiguities. This protocol was developed in part on past experience and in part on a case-by-case basis. R 239, 311. In the Charging and Sentencing Study the coders were given two general rules to resolve ambiguities of fact. The first rule was that the ambiguity ought to be resolved in a direction that supports the determination of the factfinder. The second rule is that when the record concerning a fact is ambiguous the interpretation

should support the legitimacy of the sentence. R 423, EG 4.

As to each foil the coder had four choices. The response could be coded as 1, showing that the factor was definitely present, or 2, which means that the file indicated the presence of the factor. If the factor was definitely not present, the foil was left blank. In cases where it was considered equally possible for the factor to be absent or present, the coder entered the letter "U." R 517. For the purpose of making these coding decisions, it was assumed that if the file indicated that a witness who would likely have seen the information was present or if, in the case of physical evidence, it was of the type that the police would likely have been able to view, and if such information did not appear in the Parole Board summaries, then the coder treated that factor as not being present. R 521.

In addition to coding questionnaires the coders were asked to prepare brief summaries that were intended to highlight parts of the crime that were difficult to code. R 366.

By the end of the summer of 1981 the questionnaires had been coded in Georgia and they were returned to Iowa. R 585. All of the data collected had to be entered onto a magnetic tape, and this process was completed by the Laboratory for Political Research at the University of Iowa. R 595. That laboratory "cleaned" the data as it was keypunched; that is, where an impermissible code showed up in a questionnaire it was reviewed by a student coder who re-coded the questionnaire based upon a reading of Baldus's file. R 600–08.

After the data gathered for the Charging and Sentencing Study was entered on computer tapes, it was re-coded so that the data would be in a useful format for the planned analysis. The first step of the re-coding of the data was to change all 1 and 2 codes to 1, indicating that the factor was positively present. The procedure then re-coded all other responses as 0, meaning that the characteristic was not present. R 617–20.

It appears to the court that the researchers attempted to be careful in that data-gathering, but, as will be pointed out hereafter, the final data base was far from perfect. An important limitation placed on the data base was the fact that the questionnaire could not capture every nuance of every case. R 239.

Because of design of earlier questionnaires, the coders were limited to only three special precipitating events. There were other questions where there were limitations upon responses, and so the full degree of the aggravating or mitigating nature of the circumstances were not captured. In these situations where there was only a limited number of foils, the responses were coded in the order in which the student discovered them, and, as a consequence, those entered were not necessarily the most important items found with respect to the variable. R 545. The presence or absence of enumerated factors were noted without making any judgment as to whether the factor was indeed mitigating or aggravating in the context of the case. R 384.

In the Charging and Sentencing Study as well, there were instances where there was a limit on the number of applicable responses which could be entered. For example, on the variable "Method of Killing," only three foils were provided. R 461, EG 6A, p. 14. The effect of this would be to reduce the aggravation of a case that had multiple methods of inflicting death. In coding this variable the students generally would list the method that actually caused the death and would not list any other contributing assaultive behavior. R 463.

The information available to the coders from the Parole Board files was very summary in many respects. For example, on one of the completed questionnaires the coder had information that the defendant had told four other people about the murder. The coder could not, however, determine from the information in the file whether the defendant was bragging about the murder or expressing remorse. R 467–68. As the witnesses to his statements

were available to the prosecution and, presumably, to the jury, that information was knowable and probably known. It was not, however, captured in the study. The Parole Board summaries themselves were brief and the police reports from which the parole officers prepared their reports were typically only two or three pages long. R 1343.

Because of the incompleteness of the Parole Board studies, the Charging and Sentencing Study contains no information about what a prosecutor felt about the credibility of any witnesses. R 1117. It was occasionally difficult to determine whether or not a co-perpetrator testified in the case. One of the important strength of the evidence variables coded was whether or not the police report indicated clear guilt. As the police reports were missing in 75% of the cases, the coders treated the Parole Board summary as a police report. R 493–94. Then, the coders were able to obtain information based only upon their impressions of the information contained in the file. R 349.

Some of the questionnaires were clearly mis-coded. Because of the degree of latitude allowed the coders in drawing inferences based on the data of the file, a re-coding of the same case by the same coder at a time subsequent might produce a different coding. R 370, 386–87. Also, there would be differences in judgment among the coders. R 387.

Several questionnaires, including the one for McCleskey and for one of his co-perpetrators, was reviewed at length during the hearing. There were inconsistencies in the way several variables were coded for McCleskey and his co-perpetrator. R 1113; Res. 1, Res. 2.

The same difficulties with accuracy and consistency of coding appeared in the Charging and Sentencing questionnaires. For example, the Charging and Sentencing Study had a question as to whether or not the defendant actively resisted or avoided arrest. McCleskey's questionnaire for the Charging and Sentencing Study indicated that he did not actively resist or avoid

arrest. His questionnaire for the Procedural Reform Study indicated that he did. R 1129–30; Res. 2, Res. 4. Further, as noted above in one situation where it was undoubtedly knowable as to whether or not the defendant expressed remorse or bragged about the homicide, the factor was coded as "U." Under the protocol referred to earlier, if there was a witness present who could have known the answer and the answer did not appear in the file, then the foil is to be left blank. This indicates that the questionnaire, EG 6B, was not coded according to the protocol at foils 183 and 184.

To test the consistency of coding judgments made by the students, Katz tested the consistency of coding of the same factor in the same case as between the two studies as to 30 or so variables. There were 361 cases which appeared in both studies. Of the variables that Katz selected there were mis-matches in coding in all but two of the variables. Some of the mis-matches were significant and occurred within factors which are generally thought to be important in a determination of sentencing outcome. For example, there were mis-matches in 50% of the cases tested as to the number of death eligible factors occurring in the case. Other important factors and the percent of mis-matches are as follows:

| | |
|---|---|
| Number of prior felonies | 33% |
| Immediate Rage Motive | 15% |
| Execution Style Murder | 18% |
| Unnecessary Killing | 18% |
| Defendant Additional Crimes | 16% |
| Bloody | 28% |
| Defendant Drug History | 25% |
| Victim Aroused Fear in the Defendant | 16% |
| Two or More Victims in All | 80% |
| Victim is a Stranger | 12% |

Respondent's Exhibit 20A, R 1440, *et seq.*

A problem alluded to above is the way the researchers chose to deal with those variables coded "U." It will be recalled that for a variable to be coded "U" in a given questionnaire, there must be sufficient circumstances in the file to suggest the possibility that it is present and to preclude the possibility that it is not

present. In the Charging and Sentencing Study there are an average of 33 variables in each questionnaire which are coded as "U." The researchers treated that information as not known to the decision-maker. R 1155. Under the protocol employed, the decision to treat the "U" factors as not being present in a given case seems highly questionable. The threshold criteria for assuming that a factor was not present were extremely low. A matter would not have been coded "U" unless there was something in the file which made the coder believe that the factor could be present. Accordingly, if the researchers wished to preserve the data and not drop the cases containing this unknown information, then it would seem that the more rational decision would be to treat the "U" factors as being present.

This coding decision pervades the data base. Well more than 100 variables had some significant number of entries coded "U." Those variables coded "U" in more than ten percent of the questionnaires are as follows (the sample size in the Charging and Sentencing Study is 1,084):

| | |
|---|---|
| Plea Bargaining | 445 |
| Employment Status of the Defendant | 107 |
| Victim's Age | 189 |
| Occupational Status of the Victim | 721 |
| Employment Status of the Victim | 744 |
| Defendant's Motive was Long-Term Hate | 284 |
| Defendant's Motive was Revenge | 202 |
| Defendant's Motive was Jealousy | 130 |
| Defendant's Motive was Immediate Rage | 181 |
| Defendant's Motive was Racial Animosity | 447 |
| Dispute While under the Influence of Alcohol or Drugs | 159 |
| Victim Mental Defective | 625 |
| Victim Pregnant | 239 |
| Victim Defenseless due to Disparity in Size or Numbers | 134 |
| Victim Support Children | 781 |
| Victim Offered No Provocation | 192 |
| Homicide Planned for More than Five Minutes | 496 |
| Execution-Style Homicide | 109 |
| Victim Pleaded for Life | 799 |
| Defendant Showed No Remorse for Homicide | 902 |
| Defendant Expressed Pleasure With Homicide | 885 |
| Defendant Created Risk of Death to | 128 |

| | |
|---|---|
| Others | |
| Defendant Used Alcohol or Drugs Before the Crime | 251 |
| Effect of Alcohol on the Defendant | 220 |
| Defendant Showed Remorse | 913 |
| Defendant Surrendered within 24 Hours | 125 |
| Victim Used Drugs or Alcohol Before Homicide | 244 |
| Effect of Drugs on Victim | 168 |
| Victim Aroused Defendant's Fear for Life | 220 |
| Victim Armed with Deadly Weapon | 155 |
| History of Bad Blood Between Defendant and Victim | 173 |
| Victim Accused Defendant of Misconduct | 117 |
| Victim Physically Assaulted Defendant at Homicide | 159 |
| Victim Verbally Threatened Defendant at Homicide | 185 |
| Victim Verbally Abused Defendant at Homicide | 300 |
| Victim Verbally Threatened Defendant Earlier | 100 |
| Victim Verbally Abused Defendant Earlier | 156 |
| Victim Had Bad Criminal Reputation | 665 |
| Victim had Criminal Record | 946 |

A large number of other variables were coded "U" in more than five percent of the questionnaires. Race of the victim was unknown in 62 cases. Other variables which are often thought to explain sentencing outcomes and which were coded "U" in more than five percent of the questionnaires included:

| | |
|---|---|
| Defendant's Motive was Sex | 68 |
| Defendant's Motive Silence Witness for Current Crime | 72 |
| Dispute with Victim/Defendant over Money/Property | 76 |
| Lovers' Triangle | 74 |
| Victim Defenseless due to Old Age | 63 |
| Defendant Actively Resisted Arrest | 67 |
| Number of Victims Killed by the Defendant | 66 |
| Defendant Cooperated with Authorities | 72 |
| Defendant had History of Drug and Alcohol Abuse | 79 |
| Victim Physically Injured Defendant at Homicide | 63 |
| Victim Physically Assaulted Defendant Earlier | 71 |

Many of the variables showing high rates of "U" codings were used in Baldus's models. For example, in Exhibit DB 83, models controlling for 13, 14 and 44 variables, respectively, are used in an effort to measure racial disparities. In the 13-variable model, five of the variables have substantial numbers of "U" codes. In the 14-variable mod-

el, seven variables are likewise affected, and in the 44-variable model, six were affected. Similar problems plagued the Procedural Reform Study. Respondent's Exhibits 17A, 18A; DB 96A, DB 83, R 1429.

Because of the substantial number of "U" codes in the data base and the decision to treat that factor as not present in the case, Woodworth re-coded the "U" data so that the coding would support the outcome of the case and ran a worst case analysis on five small models. This had the effect generally of depressing the coefficients of racial disparity by as much as 25%. In the three models which controlled for a relatively small number of background variables, he also re-computed the standard deviation based on his worst case analysis. In the two larger models on which he ran these studies, he did not compute the standard deviation, and in the largest model he did not even compute the racial coefficients after conducting the worst case analysis. Accordingly, it is impossible for the court to determine if the coefficient for race of the victim remains present or is statistically significant in these larger order regressions. Both because of this and because the models used in the validating procedure were not themselves validated, it cannot be said that the coding decision on the "U" data made no effect on the results obtained. See generally GW 4, Table 1.

In DB 122 and 123 Baldus conducts a worst case analysis which shows the results upon re-coding "U" data so as to legitimize the sentence. Baldus testified that the coding of unknowns would not affect the outcome of his analysis based on the experiments and these exhibits. The experiments do not, however, support his conclusion, and it would appear to the court that the experiments were not designed to support his conclusions. In DB 122 Baldus controls for only three variables; thence, it is impossible to measure the effect of any other variables or the effects that the re-coding would have on the outcome. In DB 123 he utilizes a 39-variable model and concludes that on the basis of the re-coding it has no effect on the racial coefficients. Only five of the variables in the 39-variable

model have any substantial coding problems associated with them. (For these purposes the court is defining a "substantial problem" as a variable with more than 100 entries coded "U.") These five variables are the presence of a statutory aggravating factor B3 and B7D, hate, jealousy, and a composite of family, lover, liquor, or barroom quarrel. Baldus did not test any of his larger regressions to see what the effect would be. R 1701, *et seq.*, DB 96A, Schedule 4, DB 122, DB 123, Res. Exh. 47A.

In addition to the questionable handling of the "U" codes, there were other factors which might affect the outcome of the study where information was simply unknown or unused. In the Charging and Sentencing Study data related with the response "Other" was not used in subsequent analyses. In one factor, "special aggravating feature of the offense," there were 139 "Other" responses. R 1392, 1437.

Cases where the race of the victim was unknown were coded on the principle of imputation, as though the race of the victim was the same as the race of the defendant. R 1096.

There were 23 or 24 cases in the Procedural Reform Study and 62 or 63 cases in the Charging and Sentencing Study where the researchers did not know whether or not a penalty trial had been held. R 1522. Baldus, on the basis of the rate at which penalty trials were occurring in his other cases, predicted what proportion of these that probably proceeded to a penalty trial. The criteria for deciding precisely which of these cases proceeded to a penalty trial and which did not is unknown to the court. R 1101. It is not beyond possibility that the treatment of these 62 cases could have skewed the results. The data becomes important in modeling the prosecutorial decisions to seek a death sentence after there had been a conviction. Based on his sample Baldus projects that something over 760 murder convictions occurred. If the 62 cases were proportionally weighted by a factor of 2.3 (2484 cases in the universe

divided by 1084 cases in the sample equals 2.3), the effect would be the same as if he were missing data on 143 cases. Said another way, he would be missing data on about 18 to 20% of all of the decisions he was seeking to study. *See generally* R 1119.

The study was also missing any information on race of the victim where there were multiple victims. R 1146–47. Further, Baldus was without information on whether or not the prosecutor offered a plea bargain in 40% of the cases. R 1152. One of the strength of the evidence questions related to whether or not there was a credibility problem with a witness. Such information was available only in a handful of files. R 532–33. Further, the data would not include anything on anyone who was convicted of murder and received probation. R 186.

Multiple regression requires complete correct data to be utilized. If the data is not correct the results can be faulty and not reliable. R 1505–06. Katz urged that the most accepted convention in dealing with unknowns is to drop the observations from the analysis. R 1501–04. Berk opined that missing data seldom makes any difference unless it is missing at the order of magnitude of 30 to 45%. R 1766. This opinion by Berk rests in part upon his understanding that the missing data, whether coded "U" or truly missing, was unknowable to the decision-maker. In the vast majority of cases this is simply not the case.

*After a consideration of the foregoing, the court is of the opinion that the data base has substantial flaws and that the petitioner has failed to establish by a preponderance of the evidence that it is essentially trustworthy.* As demonstrated above, there are errors in coding the questionnaire for the case *sub judice*. This fact alone will invalidate several important premises of petitioner's experts. Further, there are large numbers of aggravating and mitigating circumstances data about which is unknown. Also, the researchers are without knowledge concerning the deci-

sion made by prosecutors to advance cases to a penalty trial in a significant number of instances. The court's purpose here is not to reiterate the deficiencies but to mention several of its concerns. It is a major premise of a statistical case that the data base numerically mirrors reality. If it does not in substantial degree mirror reality, any inferences empirically arrived at are untrustworthy.

### 4. *Accuracy of the Models*

In a system where there are many factors which affect outcomes, an unadjusted binomial analysis cannot explain relationships. According to Baldus, no expert opinion of racial effects can rest upon unadjusted figures. R 731. In attempting to measure the effect of a variable of interest, Baldus testified that if a particularly important background variable is not controlled for, the coefficient for the variable of interest does not present a whole picture. Instead, one must control for the background effects of a variety of factors at once. One must, Baldus testified, identify the important factors in the system and control for them. R 694–95. Baldus also testified that a study which does not focus on individual stages in the process and does not control for very many background factors is limited in its power to support an inference of discrimination. R 146–47. Because he realized the necessity of controlling for all important background variables, he read extensively, consulted with peers, and from these efforts and from his prior analysis of data sets from California and Arkansas, he sought in his questionnaires to obtain information on every variable he believed would bear on the matter of death-worthiness of an individual defendant's case. His goal was to create a data set that would allow him to control for all of those background factors. R 194–95, 739. At this point it is important to emphasize a difference between the Procedural Reform Study and the Charging and Sentencing Study. The Procedural Reform Study contains no measures for strength of the evidence. Because Baldus was of the opinion that this could be a factor in wheth-

er or not capital punishment was imposed, information regarding the strength of the evidence was collected in the Charging and Sentencing Study. R 124, 286.

Baldus collected data on over 500 factors in each case. From the 500 variables he decided to select 230 for inclusion in further statistical analysis. R 659. He testified without further explanation that these 230 variables were the ones that he would expect to explain who received death sentences and who did not. R 661. X 631. Based on this testimony it follows that any model which does not include the 230 variables may very possibly not present a whole picture.

The 230 variable-model has several deficiencies. It assumes that all of the information available to the data-gatherers was available to each decision-maker in the system at the time that decisions were made. R 1122. This is a questionable assumption. To the extent that the records of the Parole Board accurately reflect the circumstances of each case, they present a retrospective view of the facts and circumstances. That is to say, they reflect a view of the case after all investigation is completed, after all pretrial preparation is made, after all evidentiary rulings have been handed down, after each witness has testified, and after the defendant's defense or mitigation is aired. Anyone who has ever tried a lawsuit would testify that it is seldom and rare when at progressive stages of the case he knows as much as he knows by hindsight. Further, the file does not reflect what was known to the jury but only what was known to the police. Legal literature is rife with illustrations of information known reliably to the parties which they never manage to get to the factfinders. Consequently, the court feels that any model produced from the data base available is substantially flawed because it does not measure decisions based on the knowledge available to the decision-maker.

Beyond that defect, there are other reasons to distrust the 230-variable model or any of the others proposed by Baldus. Statisticians have a method for measuring what portion of the variance in the dependent variable (here death sentencing rate) is accounted for by the independent variables included in the model. This measure is known as an adjusted $r^2$. The $r^2$ values for a model which is perfectly predictive of changes in the dependent variable would have a value of 1.0. The $r^2$ values for the models utilized by Woodworth to check the validity of his statistical techniques range from .15 to .39. The $r^2$ for the 230-variable model is between .46 and .48. The difference between the $r^2$ value and 1 may be explained by one of two hypotheses. The first is that the other unaccounted-for factors at work in the system are totally random or unique features of individual cases that cannot be accounted for in any systematic way. The other theory is that the model does not model the system. R 1266–69, GW 4, Table 1. As will appear hereafter, neither Baldus nor Woodworth believes that the system is random.

In summary, the $r^2$ measure is an indicia of how successful one has been with one's model in predicting the actual outcome of cases. R 1489. As the 230-variable model does not predict the outcome in half of the cases and none of the other models produced by the petitioner has an $r^2$ even approaching .5, the court is of the opinion that none of the models are sufficiently predictive to support an inference of discrimination.

The regression equation, discussed in greater detail hereafter, postulates that the value of the dependent variable in a given case is the sum of the coefficients of all of the independent variables plus "U." In the equation the term "U" refers to all unique characteristics of an individual case that have not been controlled for on a system-wide basis. X 51–52. If the model is not appropriately inclusive of all of the systematic factors, then the "U" value will contain random influences as well as systematic influences. X 90. The $r^2$ value is a summary statistic which describes collectively all of the "U" terms.

Sometimes it is said that "U" measures random effects. Woodworth testified that

randomness does not necessarily reflect arbitrariness. He continued, "The world really isn't random. When we say something is random, we simply mean it's unaccountable, and that whatever does account for it is unique to each case.... This randomness that we use is a tag that phenomena which are unpredictable on the basis of variables we have observed [sic]." R 1272–73. By implication this means that even in the 230-variable model it is unique circumstances or uncontrolled-for variables which preponderate over the controlled-for variables in explaining death sentencing rates. This is but another way of saying that the models presented are insufficiently predictive to support an inference of discrimination.

None of the models presented have accounted for the alternative hypothesis that the race effects observed cannot be explained by unaccounted-for factors. This is further illustrated by an experiment that Katz conducted. He observed that when he controlled only for whether or not there had been a murder indictment and tried to predict the outcome based solely on the race of the victim, he obtained a regression coefficient of .07 which was statistically significant at the .00000000000000000005 level. He further observed that by the time Baldus had controlled for 230 variables, the "P" value or test of statistical significance was only approximately .02. He stated as his opinion that the positive value of the race of the victim coefficient would not disappear because it was a convenient variable for the equation to use in explaining actual outcome where so many cases in the sample were white victim cases. It was his opinion, however, that the race of the victim coefficient would become statistically insignificant with a model with a higher $r^2$ which better accounted for all of the non-racial variables including interaction variables and composite variables which could be utilized. R 1563–70. This methodical decline in statistical significance of the race of the victim and race of the defendant effects as more variables are controlled for is demonstrated graphically in Table 1 which is attached to the opinion as Appendix A.[2] There, it will be observed that if an additional 20 background variables are added beyond the 230-variable model and the data is adjusted to show the effect on death sentencing rates of appellate review, both the size of the coefficient for race of the victim and race of the defendant decreases by one-third, and the statistical significance decreases to .04 and .05, respectively.[3]

Based on the evidence the court is unable to find either way with respect to Katz's hypothesis. From the evidence offered in support and in contradiction of the hypothesis, the court does learn one thing: It was said that one indication of the completeness of a model is when one can find no additional variables to add which would affect the results obtained. The work by Katz and Woodworth shows instability in the findings of the small order models utilized in the study, and, therefore, it is further evidence that they are not sufficiently designed so as to be reliable. *See generally* R 1729, Table 1, GW 6, Res. Exh. 24.

*Based on all the foregoing, the court finds that none of the models utilized by the petitioner's experts are sufficiently predictive to support an inference of discrimination.*

2. The teaching of this chart has a universal lesson for courts. That lesson is that where there is a multitude of factors influencing the decision-maker, a court cannot rely upon tests of statistical significance to validate the data unless it is first shown that the statistical model is sufficiently predictive.

3. Woodworth commented on this opinion of Katz's. He testified that it was his observation that after about ten variables were added to the model, the precipitous drop in levels of statistical significance leveled out, and, therefore, he was of the opinion that it would require the addition of an enormous number of variables to make the coefficient insignificant. He had no opinion as to whether the addition of a number of variables would inevitably remove the effect. In fact, however, the trend line on GW 6 for statistical significance does not remain flat, even in Woodworth's studies. From the 10 to 20-variable models to the 230-variable models, the "P" value declines from something just under .00003 to something just over .005.

### 5. *Multi-Colinearity.*

As illustrated in Table 1, the petitioner introduced a number of exhibits which reflected a positive coefficient for the race of the victim and race of the defendant. The respondent has raised the question of whether or not those coefficients are in fact measuring racial disparities or whether the racial variables are serving as proxies for other permissible factors. Stated another way, the respondent contends that the Baldus research cannot support an inference of discrimination because of multi-colinearity.

If the variables in an analysis are correlated with one another, this is called multi-colinearity. Where this exists the coefficients are difficult to interpret. R 1166. A regression coefficient should measure the impact of a particular independent variable, and it may do so if the other variables are totally uncorrelated and are independent of each other. If, however, there is any degree of interrelationship among the variables, the regression coefficients are somewhat distorted by that relationship and do not measure exactly the net impact of the independent variable of interest upon the dependent variable. Where multi-colinearity obtains, the results should be viewed with great caution.

In the Charging and Sentencing Study a very substantial proportion of the variables are correlated to the race of the victim and to the death sentencing result. R 1141–42. All or a big proportion of the major nonstatutory aggravating factors and statutory aggravating factors show positive correlation with both the death sentencing result and the race of the victim. R 1142. More than 100 variables show statistically significant relationships with both death sentencing results and the race of the victim. R 1142. Because of this it is not possible to say with precision what, if any, effect the racial variables have on the dependent variable. R 1148, 1649. According to Baldus, tests of statistical signifi-

cance will not always detect errors in coefficients produced by multi-colinearity. R 1138, DB 92.

Katz conducted experiments which further demonstrated the truth of an observation which Baldus made: white-victim cases tend to be more aggravated while black-victim cases tend to be more mitigated. Using the data base of the Procedural Reform Study, Katz conducted an analysis on 196 white-victim cases and 70 black-victim cases which had in common the presence of the statutory aggravating factor B2.[4] Factor by factor, he determined whether white-victim cases or black-victim cases had the higher incidence of each aggravating and mitigating factor. The experiment showed that there were 25 aggravating circumstances which appeared at a statistically significant higher proportion in cases involving one racial group than they did in the other. Of these 25 aggravating circumstances, 23 of these occurred in white-victim cases and only 2 occurred in black-victim cases. Likewise with mitigating factors it was determined that 12 mitigating factors appeared in a higher proportion of black-victim cases whereas only one mitigating feature appeared in a higher proportion of white-victim cases. The results of this latter analysis were also statistically significant. R 1472, *et seq.*, Res.Exh. 28. Similar or more dramatic results were obtained when the experiment was repeated with statutory factors B1, 3, 4, 7, 9 and 10. Res.Exh. 29–34; R 1477–80.

As he had done with the data from the Procedural Reform Study, Katz conducted an analysis to discover the relative presence or absence of aggravating or mitigating circumstances in white- and black-victim cases, using the Charging and Sentencing Study data. Only aggravating or mitigating circumstances shown to be significant at the .05 level were utilized. Unknown responses were not considered. With but slight exception, each aggravating factor was present in a markedly high-

---

**4.** Katz utilized Baldus's characterization of factors as to whether they were aggravating or mitigating.

er percentage of white-victim cases than in black-victim cases, and conversely, the vast majority of the mitigating circumstances appeared in higher proportions in black-victim cases. Res.Exh. 49, 50, R 1534–35. Similar observations were made with reference to cases disposed of by conviction of voluntary manslaughter. Res.Exh. 51, 52, R 1536.

Yet another experiment was conducted by Katz. He compared the death sentencing rates for killers of white and black victims at steps progressing upwards from the presence of no statutory aggravating circumstances to the presence of six such circumstances. At the level where there were three or four statutory aggravating circumstances present, a statistically significant race of the victim effect appeared. He then compared the aggravating and mitigating circumstances within each group and in each instance found on a factor-by-factor basis that there was a higher number of aggravating circumstances which occurred in higher proportions in white-victim cases and a number of mitigating factors occurred in higher proportions in black-victim cases. The results were statistically significant. Res.Exh. 36, 37, R 1482.

All of the experts except Berk seemed to agree that there was substantial multi-colinearity in the data. Berk found rather little multi-colinearity. R 1756. Woodworth observed that multi-colinearity has the effect of increasing the standard deviation of the regression coefficients, and he observed that this would reduce the statistical significance. According to Woodworth the net effect of multi-colinearity would be to dampen the effect of observed racial variables. R 1279–82. He also testified that he had assured himself of no effect from multi-colinearity because they were able to measure the disparities between white-victim and black-victim cases at similar levels of aggravation. For these two reasons Woodworth had the opinion that higher levels of aggravation in white-victim cases were not relevant to any issue. R 1297.

The court cannot agree with Woodworth's assessment. He and Baldus seem to be at odds about whether tests of statistical significance will reveal and protect against results produced by multi-colinearity. His second point is also unconvincing. He contends that because he can measure a difference between the death sentencing rate in white-victim cases and black-victim cases at the same level of aggravation (and presumably mitigation), then the positive regression coefficients for this variable are not being produced by multi-colinearity. If Woodworth's major premise were correct, his conclusion might be tenable. The major premise is that he is comparing cases with similar levels of aggravation and mitigation. He is not. As will be discussed hereafter, he is merely comparing cases which have similar aggravation indices based on the variables included in the model. None of Woodworth's models on which he performed his diagnostics are large order regression analyses. Accordingly, they do not account for a majority either of aggravating or mitigating circumstances in the cases. Therefore, in the white-victim cases there are unaccounted-for systematic aggravating features, and in the black-victim cases there are unaccounted-for systematic mitigating features. As will be seen hereafter, aggravating factors do increase the death penalty rate and mitigating factors do decrease the death penalty rate. Therefore, at least to the extent that there are unaccounted-for aggravating or mitigating circumstances, ' white-victim cases become a proxy for aggravated cases, and black-victim cases become a proxy, or composite variable, for mitigating factors.

*The presence of multi-colinearity substantially diminishes the weight to be accorded to the circumstantial statistical evidence of racial disparity.*

6. *Petitioner's Best Case and Other Observations.*

*Based on what has been said to this point, the court would find that the petitioner has failed to make out a prima*

*facie case of discrimination based either on race of the victim or race of the defendant disparity.* There are many reasons, the three most important of which are that the data base is substantially flawed, that even the largest models are not sufficiently predictive, and that the analyses do not compare like cases. The case should be at an end here, but for the sake of completeness, further findings are in order. In this section the statistical showings based on the petitioner's most complete model will be set out, together with other observations about the death penalty system as it operates in the State of Georgia.

Woodworth testified, "No, the system is definitely not purely random. This system very definitely sorts people out into categories on rational grounds. And those different categories receive death at different rates." R 1277. An analysis of factors identified by Baldus as aggravating and mitigating, when adjusted to delete unknown values, gives a picture of a rational system when measured against case outcome. Virtually without exception, the presence of aggravating factors increases as the outcome moves from voluntary manslaughter to life sentence to death sentence. Conversely, factors identified by Baldus as being mitigating decrease in presence in cases as the outcome moves from voluntary manslaughter to life sentence to death sentence. R 1532. Res. Exh. 48.

*These observations, other testimony by all of the experts, and the court's own analysis of the data put to rest in this court's mind any notion that the imposition of the death penalty in Georgia is a random event unguided by rational thought.* The central question is whether any of the rationales for the imposing or not imposing of the death penalty are based on impermissible factors such as race of the defendant or race of the victim. In *Baldus's* opinion, based on his entire study, there are systematic and substantial disparities existing in the penalties imposed upon homicide defendants in the State of Georgia based on race of the homicide victim. Further, he was of the opinion that disparities in death sentencing rates do exist based on the race of the defendant, but they are not as substantial and not as systematic as is the case with the race of the victim effect. He was also of the opinion that both of these factors were at work in Fulton County. R 726–29. *The court does not share Dr. Baldus's opinion to the extent that it expresses a belief that either of these racial considerations determines who receives the death penalty and who does not.*

Petitioner's experts repeatedly testified that they had added confidence in their opinions because of "triangulation." That is, they conducted a number of different statistical studies and they all produced the same results. R 1081–82. This basis for the opinion is insubstantial for two reasons. First, many tests showed an absence of a race of the defendant effect or an absence of a statistically significant race of the defendant effect or a statistically insignificant modest race of the defendant effect running against white defendants. As will be seen below, the race of the victim effect observed, while more persistent, did not always appear at a statistically significant level in every analysis. Second, Baldus's confidence is predicated upon a navigational concept, triangulation, which presumes that the several bearings being taken are accurate. The lore of the Caribbean basin is rich with tales of island communities supporting themselves from the booty of ships which have foundered after taking bearings on navigational aids which have been mischievously rearranged by the islanders. If one is going to navigate by triangulation, one needs to have confidence in the bearings that are being shot. As discussed earlier, Baldus is taking his bearings off of many models, none of which are adequately inclusive to predict outcomes with any regularity.

Baldus has testified that his 230-variable model contains those factors which might best explain how the death penalty is imposed. The court, therefore, views results produced by that model as the most reliable

evidence presented by the petitioner. Additionally, in some tables Baldus employed a 250–variable model which adjusted for death sentencing rates after appellate review by Georgia courts. The race of the victim and race of the defendant effects, together with the "P" values, are shown in the table below.

TABLE 2

RACIAL EFFECTS TAKING INTO ACCOUNT ALL DECISIONS IN THE SYSTEM -- LARGE SCALE REGRESSIONS

Weighted Least Squares Regression Results

Coefficients and Level of Statistical Significance

| 230 Variable Model | |
| --- | --- |
| Race of the Victim | Race of Defendant |
| .06 | .06 |
| (.02) | (.02) |

| 250 Variable Model | |
| --- | --- |
| After Adjustment for Georgia Appellate Review | |
| Race of the Victim | Race of Defendant |
| .04 | .04 |
| (.04) | (.05) |

In viewing Table 2, it is important to keep in mind that it purports to measure the net effect of the racial variables on all decisions made in the system from indictment forward. It shows nothing about the effect of the racial variables on the prosecutor's decision to advance a case to a penalty trial and nothing about the effect of the racial variables on the jury and its decision to impose the death penalty.

At this point it is instructive to know how Dr. Baldus interpreted his own findings on the racial variables. He says that the impact of the racial variable is small. R 831. The chances that anybody is going to receive a death sentence is going to depend on what the other aggravating and mitigating circumstances are in the case. R 828. At another point Baldus testified that:

[t]he race of the victim in this system is clearly not the determinant of what happened, but rather that it is a factor like a number of other factors, that it plays a role and influences decision making.

The one thing that's, that struck me from working with these data for some time, there is no one factor that deter-

mines what happens in the system. If there were, you could make highly accurate predictions of what's going to happen. This is a system that is highly discretionary, highly complex, many factors are at work in influencing choice, and no one factor dominates the system. It's the result of a combination of many different factors that produce the results that we see, each factor contributing more or less influence.

R 813. And at another point Dr. Baldus interpreted his data as follows:

The central message that comes through is the race effects are concentrated in categories of cases where there's an elevated risk of a death sentence. There's no suggestion in this research that there is a uniform, institutional bias that adversely affects defendants in white victim cases in all circumstances, or a black defendant in all cases. There's nothing to support that conclusion. It's a very complicated system.

R 842.

*Because of these observations, the testimony of other witnesses, and the court's own analysis of the data, it agrees that any racial variable is not determinant of who is going to receive the death penalty, and, further, the court agrees that there is no support for a proposition that race has any effect in any single case.*

An exhibit, DB 95, is produced in part in Table 3 below. It is perhaps the most significant table in the Baldus study. This table measures the race of the victim and the race of the defendant effect in the prosecutorial decision to seek the death sentence and in the jury sentencing decision to impose the death sentence. This is one of the few exhibits prepared by Baldus which utilizes data both from the Procedural Reform Study and the Charging and Sentencing Study. The first column shows the racial effects after controlling for 230 variables in the Charging and Sentencing Study and 200 variables in the Procedural Reform Study.

## TABLE 3

REGRESSION COEFFICIENTS (WITH THE LEVEL OF STATISTICAL
SIGNIFICANCE IN PARENTHESES) FOR RACIAL VARIABLES IN
ANALYSES OR PROSECUTORIAL DECISIONS TO SEEK AND JURY
DECISIONS TO IMPOSE CAPITAL PUNISHMENT

| | | Controlling for All Factors in File (230 variables in Charging & Sentencing Study; 200 variables in Procedural Reform Study) | |
|---|---|---|---|
| I. Prosecutor Decision to Seek a Death Sentence | | Regardless of Statistical Significant | If Statistically Significant at .10 Level |
| A. Race of Victim | | | |
| | 1. Charging and Sentencing Study | .21 (.06) | .18 (.0001) |
| | 2. Procedural Reform Study | .12 (.01) | .13 (.0001) |
| B. Race of Defendant | | | |
| | 1. Charging and Sentencing Study | .09 (.42) | .14 (.002) |
| | 2. Procedural Reform Study | .01 (.96) | .03 (.41) |
| II. Jury Sentencing Decisions [1] | | | |
| A. Race of Victim | | | |
| | 1. Charging and Sentencing Study | [2] | .05 (.37) |
| | 2. Procedural Reform Study | | .06 (.42) |
| B. Race of Defendant | | | |
| | 1. Charging and Sentencing Study | | −.04 (.42) |
| | 2. Procedural Reform Study | | −.02 (.75) |

[1] Unweighted data used.
[2] Simultaneous adjustment for all factors in the files was not possible because of the limited number of penalty trial decisions. (From DB 95).

The coefficients produced by the 230–variable model on the Charging and Sentencing Study data base produce no statistically significant race of the victim effect either in the prosecutor's decision to seek the death penalty or in the jury sentencing decision. A 200–variable model based on the Procedural Reform data base shows a statistically significant race of the victim effect at work on the prosecutor's decision-making, but that model is totally invalid for it contains no variable for strength of the evidence, a factor which has universally been accepted as one which plays a large part in influencing decisions by prosecutors. Neither model produces a statistically significant race of the defendant effect at the level where the prosecutor is trying to decide if the case should be advanced to a penalty trial. Neither model produces any evidence that race of the victim or race of the defendant has any statistically sig-

nificant effect on the jury's decision to impose the death penalty. The significance of this table cannot be overlooked. The death penalty cannot be imposed unless the prosecutor asks for a penalty trial and the jury imposes it. *The best models which Baldus was able to devise which account to any significant degree for the major non-racial variables, including strength of the evidence, produce no statistically significant evidence that race plays a part in either of those decisions in the State of Georgia.*[5]

The same computations were repeated using only factors which were statistically significant at the .10 level.[6] The court knows of no statistical convention which would permit a researcher arbitrarily to exclude factors on the basis of artificial criteria which experience and other research have indicated have some influence on the decisions at issue. The fact that a variable may not be statistically significant is more likely a reflection of the fact that it does not occur often, and not any sort of determination that when it does occur it lacks effect. Accordingly, the second model, set out in Table 3, does not meet the criterion of having been validated by someone knowledgeable about the inner workings of the decision-making process.

The results in the second column are reproduced here because they demonstrate some other properties of the research. It is noted first that the race of the victim effect is lower in the Procedural Reform Study than in the Charging and Sentencing Study. As the Procedural Reform Study represents a universe of all cases and the Charging and Sentencing Study is a random sample, one possible explanation for the disparity in magnitude might be that the sampling techniques utilized in the Charging and Sentencing Study somehow overestimated the coefficients. Another in-

teresting observation from this study is that even when the data is artificially manipulated, no statistically significant race of the victim or race of the defendant effect appears at the jury decision level. Last, this table demonstrates a property of the analyses throughout regarding race of the defendant. To the extent that race of the defendant appears as a factor, it sometimes appears as a bias against white defendants and sometimes appears as a bias against black defendants; very often, whatever bias appears is not statistically significant.

Finally, this table is an illustration of a point which the court made earlier. At the beginning, in assessing the credibility of the witnesses, the court noticed that all seemed to have something of a partisan bias. Thereafter, it noted that the results of certain diagnostics respecting the worst case analysis in Woodworth's work were not reported in the exhibits given the court. Here, in this table, we are given no outcomes based on the larger scaled regressions for the racial variables at the jury sentencing level. It is said that the data was not provided because it was not possible to conduct simultaneous adjustment for all factors in the file because of the limited number of penalty trial decisions. From all that the court has learned about the methods employed, it does not understand that the analysis was impossible, but instead understands that because of the small numbers the results produced may not have been statistically significant.

The figures on racial disparities in prosecutorial and jury decision-making do not reflect the effects of racial disparities that might have resulted in earlier phases of the system. R 933. A stepwise regression analysis of the statewide data in the Charging and Sentencing Study was done in an effort to measure the race of the victim and race of the defendant effects at different stages

5. As an aside, the court should think that this table should put to rest the sort of stereotypical prejudice against Southern jurisdictions typified in the petitioner's brief by reliance on evidence in the Congressional Record in the 1870's concerning the existence of a disregard by Southern officials for the value of black life.

6. The regression coefficient of an independent variable would be the same regardless of whether it was a rare event or a frequent event. X 33.

of the procedure from indictment through the imposition of the death penalty.[7] This regression analysis suggested that there is an increased willingness by prosecutors to accept pleas to voluntary manslaughter if the race of the victim is black. R 1062–68, DB 117. This suggests a possibility that the racial effects observed in Table 2 may be the result of bias at a plea bargaining stage.[8] This is not established by the evidence, and it is immaterial to this case, for Baldus did not believe that McCleskey's case would have had any likelihood of being disposed of on a voluntary manslaughter plea. R 1064–65. Baldus noted that there were strong effects with respect to both race of the defendant and race of the victim at the plea bargaining level. R 1040. It is to be remembered that on this point his data base was far from complete. Finally, it is noted that this study did not attempt to discern if any of the racial disparities noted at the plea bargaining stages could be explained by any of the current theories on the factors governing plea bargaining. R 1159–63.

### 7. What a Multivariate Regression Can Prove

Before one can begin to utilize the results of the Baldus study, whether from the larger order regressions or from the small models, an understanding of the techniques employed is necessary. Such an understanding produced in the court's mind other qualifiers which at least in this case substantially diminish the weight of the evidence produced.

Regression analysis is a computational procedure that describes how the average outcome in a process, here the death sentencing rate, is related to particular charac-

teristics of the cases in the system. A least squares regression coefficient displays the average difference in the death penalty rate across all cases caused by the independent variable of interest. In a regression procedure one may theoretically measure the impact of one variable of interest while "controlling" for other independent variables. Conceptually, the coefficient of the variable of interest is the numerical difference in death sentencing rates between all cases which have the variable of interest and all cases which do not. R 689, et seq., 1222–23. The chief assumption of a weighted least square regression is that the effect of the variable of interest is consistent across all cases. Woodworth testified that that assumption was not altogether warranted in this case.[9] That the variable of interest, here race of the victim, is not the same against all cases is graphically seen in a preliminary cross tabulation done by Baldus. In this experiment, cases which were similar in that they had a few aggravating and mitigating factors in common were grouped into four subgroups. The race of the victim disparity ranged from a low of .01 through .04 to .15 and finally to .25. The weighted least squares regression coefficient for these same cases was .09. R 781, DB 76, DB 77.

Statistical significance is another term which the court and the parties used regularly. This term connotes a test for rival hypotheses. There is a possibility that an effect could be present purely by chance, or by the chance combination of bad luck in drawing a sample, or by chance combination of events in the charging and sentencing process that may produce an accidental disparity which is not systematic. Statisti-

---

**7.** Stepwise regression is a process carried out by a computer which selects the background variables sequentially based on which provides the best fit. It makes no judgment as to whether or not the variables it selects might in reality have anything to do with the decision. Any model produced by stepwise regression would not meet the legal statistical conventions discussed earlier in that the model is not validated by a person who is by experience or learning acquainted with how the process actually works.

**8.** McCleskey was offered a life sentence in return for a guilty plea. (See State Habeas Transcript, Testimony of Turner).

**9.** He testified, however, that the data was interpretable because he convinced himself that the violations of the assumption were not in themselves responsible for the findings of significant racial effects. R 1223–24, 1228.

cal significance computes the probability that such a disparity could have arisen by chance, and, therefore, it tests the rival hypothesis that chance accounts for the results that were obtained. R 1244–45. Tests of statistical significance are a measure of the amount by which the coefficient exceeds the known standard deviation in the variable, taking into account the size of the sample. Considering the values used in this study, a statistical significance at the .05 level translates into a two-standard deviation disparity, and a statistical significance at the .01 level approaches a three-standard deviation level. R 1246–47. R 712–17. As noted earlier a low "P" value, a measure of statistical significance, does not, at least in the case of multi-variate analysis, assure that the effect observed by any one model is in fact real.

The use of regression analysis is subject to abuse. Close correlations do not always say anything about causation. Further, a regression analysis is no better than the data that went into the analysis. It is possible to obtain a regression equation which shows a good statistical fit in the sense of both low "P" values and high $r^2$ values where one has a large number of variables, even when it is known in advance that the data are totally unrelated to each other. R 1636–37.

What the regression procedure does by algebraic adjustment is somewhat comparable to a cross tabulation analysis. It breaks down the cases into different sub-categories which are regarded as having characteristics in common. The variable of interest is calculated for each sub-category and averaged across all sub-categories. R 791–92.

The model tries to explain the dependent variable by the independent variables that it is given. It does this by trying to make the predicted outcome the same as the actual outcome in terms of the factors that it is given. R 1487–88. For example, if a regression equation were given ten independent variables in a stagewise process, it would guess at the regression coefficient for the first variable by measuring the incremental change in the dependent variable caused by the addition of cases containing a subsequent independent variable. X 29. After the initial mathematical computation, the equation then goes back and re-computes the coefficients it arrived at earlier, using all of the subsequent regression coefficients that it has calculated. It continues to go through that process until coefficients which best predict actual outcome are arrived at for each variable. X 43–46.

By its nature, then, the regression equation can produce endless series of self-fulfilling prophecies because it always attempts to explain actual outcomes based on whatever variables it is given. If, for example, the data base included information that of the 128 defendants who received the death penalty, 122 of them were right-handed, the regression equation would show that the system discriminated against right-handed people. This is so because that factor occurs so often that it is the most "obvious" or "easy" explanation for the outcomes observed. In the case at bar, there are 108 white-victim cases where death was imposed and 20 black-victim cases where death was imposed. DB 63. Accordingly, the regression coefficients for the racial variables could have been artificially produced because of the high incidence of cases in which the victim was white.

Another feature of Baldus's analyses is that he is trying to explain dichotomous outcomes (life or death) with largely dichotomous independent variables (multiple stabbing present or not present) and a regression equation requires continuous dependent and independent variables. Accordingly, Baldus developed indices for the dependent variable (whether or not the death penalty was imposed). He utilized an average rate for a group of cases. For the independent variables he developed an artificial measure of similarity called an aggravation index to control simultaneously for aggravating and mitigating circumstances so that cases could be ranked on a continuous scale. R 1484. It is important

to understand that the cases being compared in the regression analyses used here are not at all factually similar. Their principal identity is that their aggravation index, the total of all positive regression coefficients minus all negative regression coefficients, is similar. X 14–15. The whole study rests on the presumption that cases with similar aggravation indexes are similarly situated. R 1311. This presumption is not only rebuttable, it is rebutted, if by nothing else, then by common sense. As Justice Holmes observed in *Towne v. Eisner*, 245 U.S. 418, 38 S.Ct. 158, 62 L.Ed. 372 (1918):

> A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.

*Id.* at 425, 38 S.Ct. at 159, *quoting Lamar v. United States*, 240 U.S. 60, 65, 36 S.Ct. 255, 256, 60 L.Ed. 526 (1916). The same thought, it seems to the court, is apropos for the aggravation index. It allows a case with compelling aggravating circumstances, offset only by a series of insignificant mitigating circumstances, to be counted as equal to a case with the same level of aggravation and one substantial mitigating factor having the same numerical value as the series of trifling ones in the first case. The court understands that strength of the evidence measures generally are positive coefficients. To the extent that this is true, a strong evidentiary case with weak aggravating circumstances would be considered the same as a brutal murder with very weak evidence. Other examples abound, but the point is that there is no logical basis for the assumption that cases with similar aggravation indices are at all alike. Further, the aggravation index for any given case is a function of the variables that are included in the model. Any change in the variables included in the model will also change the aggravation index of most, if not all, cases.

The variability of the aggravation index as factors are added or deleted is well demonstrated by Respondent's Exhibit 40. One case comparison will serve as an example. In a life sentence case, C 54, an aggravation index (or predicted outcome index, R 1485) was computed using a six-variable model. Calculation produced an index of .50. Katz conducted four additional regressions, each adding additional factors. By the time the more inclusive regression number five was performed, the aggravation index or predicted outcome was .08 (0 equals no death penalty, 1 equals death penalty). In a death case, C 66, the first regression analysis produced an index of .50. However, the aggravation coefficient or predicted outcome rose to .89 when the facts of the case were subjected to the fifth regression analysis. Thence, two cases which under one regression analysis appeared to be similar, when subjected to another analysis may have a totally different aggravation index. Res.Exh. 40, R 1483–1501.

In interpreting the Baldus data it is important to understand what he means when he says that he has controlled for other independent variables or held other individual variables constant. What these terms usually mean is that a researcher has compared cases where the controlled-for variables are present in each case and where the cases are divided into groups where the variable of interest is present and where the variable of interest is not present. That is not what occurs in regression analysis. To be sure, the cases are divided into groups where the variable of interest is present and groups where it is not present. There is, however, absolutely no assurance that the background variables being controlled for are present in all of the cases, in any of the cases, or present in the same combination in any of the cases. Consequently, other factors are not being held constant as that term is usually used. *See generally* R 152, X 7, 19–25.

Courts are accustomed to looking at figures on racial disparity and understanding that the figure indicates the extent or degree of the disparity. It is often said that statistical evidence cannot demonstrate discrimination unless it shows gross disparities. Contrary to the usual case, the court

has learned that at least in this case the size of a regression coefficient, even one statistically significant at the .05 level, says nothing about the specific degree of disparity or discrimination in the system. All the regression coefficient indicates is that the difference in average outcome where the racial variable is present from cases where it is not present is large enough to enable one to say that the true mean of both groups are not exactly equal. R 1635, 1670–71. Baldus made an effort to demonstrate the relative importance of the racial variables by showing them in an array of coefficients for other variables. The court later learned, however, that where some of the variables are binary or dichotomous and some are continuous (for example, number of mitigating features present), one cannot use the size of the regression coefficient as an indication of the relative strength of one variable to another. R 1783.

Consistent with the difficulty in quantifying the effect of any variable found to be at work in the system, Baldus testified that a regression analysis really has no way of knowing what particular factors carry the most weight with the decision-maker in any one case. R 1141. Based on his entire analysis Baldus was unable to quantify the effect that race of the victim may have had in McCleskey's case. R 1083–85. After a review of the Baldus study, Berk was unable to say whether McCleskey was singled out to receive the death penalty because his victim was white, nor was he able to say that McCleskey would have escaped the death penalty if his victim had been black. Berk went on to testify:

> Models that are developed talk about the effects on the average. They do not depict the experience of a single individual. What they say, for example, that on the average, the race of the victim, if it is white, increases on the average the probability ... (that) the death sentence would be given.
>
> Whether in a given case that is the answer, it cannot be determined from statistics. R 1785.

*In summary, then, Baldus's findings from the larger scale regressions or from any of the others must be understood in light of what his methods are capable of showing. They do not compare identical cases,' and the method is incapable of saying whether or not any factor had a role in the decision to impose the death penalty in any particular case. A principal assumption which must be present for a regression analysis to be entirely reliable is that the effects must be randomly distributed—that is not present in the data we have. The regression equation is incapable of making qualitative judgments and, therefore, it will assign importance to any feature which appears frequently in the data without respect to whether that factor actually influences the decision-maker. Regression analysis generally does not control for background variables as that term is usually understood, nor does it compare identical cases. Because Baldus used an index method, comparable cases will change from model to model. The regression coefficients do not quantitatively measure the effect of the variables of interest.*

*With these difficulties, it would appear that multivariate analysis is ill suited to provide the court with circumstantial evidence of the presence of discrimination, and it is incapable of providing the court with measures of qualitative difference in treatment which are necessary to a finding that a prima facie case has been established with statistical evidence. Finally, the method is incapable of producing evidence on whether or not racial factors played a part in the imposition of the death penalty in any particular case. To the extent that McCleskey contends that he was denied either due process or equal protection of the law, his methods fail to contribute anything of value to his cause.*

### 8. A Rebuttal to the Hypothesis

A part of Baldus's hypothesis is that the system places a lower value on black life than on white life. If this is true, it would

mean that the system would tolerate higher levels of aggravation in black victim cases before the system imposes the death penalty.

The respondent postulates a test of this thesis. It is said that if Baldus's theory is correct, then one would necessarily find aggravation levels in black-victim cases where a life sentence was imposed to be higher than in white-victim cases. This seems to the court to be a plausible corollary to Baldus's proposition. To test this corollary, Katz, analyzing aggravating and mitigating factors one by one, demonstrated that in life sentence cases, to the extent that any aggravating circumstance is more prevalent in one group than the other, there are more aggravating features in the group of white-victim cases than in the group of black-victim cases. Conversely, there were more mitigating circumstances in which black-victim cases had a higher proportion of that circumstance than in white-victim cases. R 1510–15, 1540, Res. Exh. 43, 53, 54.

Because Katz used one method to demonstrate relative levels of aggravation and Baldus used another, his index method, the court cannot say that this experiment alone conclusively demonstrates that Baldus's theory is wrong. It is, however, direct rebuttal evidence of the theory, and as such, stands to contradict any prima facie case of system-wide discrimination based on race of the victim even if it can be said that the petitioner has indeed established a prima facie case. This court does not believe that he has.

9. *Miscellaneous Observations on the Statewide Data.*

So that a reader may have a better feeling of subsidiary findings in the studies and a better understanding of collateral issues in the case, some additional observations are presented on Baldus's study.

Some general characteristics of the sample contained in the Charging and Sentencing Study which the court finds of interest are as follows. The largest group of defendants was in the 18 to 25-year-old age group. Only ten percent had any history of mental illness. Only three percent were high status defendants. Only eight percent of the defendants were from out of state. Females comprised 13% of the defendants. Of all the defendants in the study 35% had no prior criminal record, while 65% had some previous conviction. Co-perpetrators were not involved in 79% of the cases, and 65% of the homicides were committed by lovers in a rage. High emotion in the form of hate, revenge, jealousy or rage was present in 66% of the cases. Only one percent of the defendants had racial hatred as a motive. Victims provoked the defendant in 48% of the cases. At trial 26% confessed and offered no defense. Self defense was claimed in 33% of the cases, while only two percent of the defendants relied upon insanity or delusional compulsion as a defense. Defendants had used alcohol or drugs immediately prior to the crime in 38% of the cases. In only 24% of the cases was a killing planned for more than five minutes. Intimate associates, friends, or family members accounted for 44% of the victims. Black defendants accounted for 67% of the total, and only 12% of the homicides were committed across racial lines. The largest proportion (58%) of the homicides were committed by black defendants against black victims. R 659, *et seq.*, DB 60.[10]

From the data in the Charging and Sentencing Study it is learned that 94% of all homicide indictments were for murder. Of those indicted for murder or manslaughter 55% did not plead guilty to voluntary man-

---

**10.** One thing of interest came out in DB 60 concerning the evaluation of the coders. In their judgment 92% of all the police reports that they studied indicated clear guilt. This is interesting in view of the fact that only 69% of all defendants tried for murder were convicted. This suggests either that the coders did not have enough experience to make this evaluation, or the more likely explanation is that the Parole Board summaries were obtained from official channels and only had the police version and had little if any gloss on the weaknesses of the case from the defendant's perspective.

slaughter. There were trials for murder in 45% of the cases and 31% of the universe was convicted of murder. In only ten percent of the cases in the sample was a penalty trial held, and in only five percent of the sample were defendants sentenced to death. DB 58, R 64–65. *See also* DB 59, R 655.

In his analysis of the charging and sentencing data, Baldus considered the effect of Georgia statutory aggravating factors on death sentencing rates, and several things of interest developed. The statutory aggravating circumstances are highly related or correlated to one another. That is to say that singularly the factors have less impact than they do in combination. Even when the impact of the statutory aggravating circumstances is adjusted for the impact of the presence of others, killing to avoid arrest increased the probability of a death sentence by 21 points, and committing a homicide during the course of a contemporaneous felony increased the probability of getting the death penalty by 12 points. R 709–11, DB 68. Where the B8 and B10 factors are present together, the death penalty rate is 39%. DB 64. Based on these preliminary studies one might conclude that a defendant committing a crime like McCleskey's had a greatly enhanced probability of getting the death penalty.

Of the 128 death sentences in the Charging and Sentencing Study population, 105 of those were imposed where the homicide was committed during the course of an enumerated contemporary offense. Further, it is noted that the probability of obtaining the death penalty is one in five if the B2 factor is present, a little better than one in five if the victim is a policeman or fireman, and the probability of receiving the death penalty is about one in three if the homicide was committed to avoid arrest. These, it is said, are the three statutory aggravating factors which are most likely to produce the death penalty, and all three were present *de facto* in McCleskey's case. DB 61.

When the 500 most aggravated cases in the system were divided into eight categories according to the level of the aggravation index, the death penalty rate rose dramatically from 0 in the first two categories, to about 7% in the next two, to an average of about 22% in the next two, to a 41% rate at level seven, and an 88% rate at level eight. Level eight was composed of 58 cases. The death sentencing rate in the 40 most aggravated cases was 100%. DB 90, R 882. Baldus felt that data such as this supported a hypothesis arrived at earlier by other social science researchers. This theory is known as the liberation hypothesis. The postulation is that the exercise of discretion is limited in cases where there is little room for choice. If the imposition of the death penalty or the convicting of a defendant is unthinkable because the evidence is just not there, or the aggravation is low, or the mitigation is very high, no reasonable person would vote for conviction or the death penalty, and, therefore, impermissible factors such as race effects will not be noted at those points. But, according to the theory, when one looks at the cases in the mid-range where the facts do not clearly call for one choice or the other, the decision-maker has broader freedom to exercise discretion, and in that area you see the effect of arbitrary or impermissible factors at work. R 884, R 1135.[11]

Baldus did a similar rank order study for all cases in the second data base. He divided the cases into eight categories with the level of aggravation increasing as the category number increased. In this analysis he controlled for 14 factors, but the record does not show what those factors were.

---

**11.** Part of the moral force behind petitioner's contentions is that a civilized society should not tolerate a penalty system which does not avenge the murder of black people and white people alike. In this connection it is interesting to note that in the highest two categories of aggravation there were only ten cases where the murderer of a black victim did not receive the death penalty while in eleven cases the death penalty under similar circumstances was imposed. This is not by any means a sophisticated statistical analysis, but even in its simplicity it paints no picture of a systematic deprecation of the value of black life.

The experiment showed that in the first five categories the death sentencing rate was less than one percent, and there was no race of the victim or race of the defendant disparity observed. At level six and nine statistically significant race of the victim disparities appeared at the 9 point and 27 point order of magnitude. Race of the defendant disparities appeared at the last three levels, but none were statistically significant. A minor race of the victim disparity was noted at level 7 but the figure was not significant. The observed death sentencing rates at the highest three levels were two percent, three percent, and 39%. DB 89. Exhibit DB 90 arguably supports Baldus's theory that the liberation hypothesis may be at work in the death penalty system in that it does show higher death sentencing rates in the mid-range cases than in those cases with the lowest and highest aggravation indices. On the other hand, Exhibit DB 89, which, unlike DB 90, is predicated on a multiple regression analysis, shows higher racial disparities in the most aggravated level of cases and lower or no racial disparities in the mid-range of aggravation. Accordingly, the court is unable to find any convincing evidence that the liberation hypothesis is applicable in this study.

Baldus created a 39-variable model which was used for various diagnostics. It was also used in an attempt to demonstrate that given the facts of McCleskey's case, the probability of his receiving the death penalty because of the operation of impermissible factors was greatly elevated. Although the model is by no means acceptable,[12] it is necessary to understand what is and is not shown by the model, as it is a centerpiece for many conclusions by petitioner's experts. On the basis of the 39-variable model McCleskey had an aggravation score of .52. Woodworth estimated that at McCleskey's level of aggravation the incremental probability of receiving the death penalty in a white-victim case is between 18 and 23 percentage points. R 1294, 1738–40, GW 5, Fig. 2. If a particular aggravating circumstance were left out in coding McCleskey's case, it would affect the point where his case fell on the aggravation index. R 1747. Judging from the testimony of Office Evans, McCleskey showed no remorse about the killing and, to the contrary, bragged about the killing while in jail. While both of these are variables available in the data base, neither is utilized in the model. If either were included it should have increased McCleskey's index if either were coded correctly on McCleskey's questionnaire. Both variables on McCleskey's questionnaire were coded as "U," and so even if the variables had been included, McCleskey's aggravation index would not have increased because of the erroneous coding. If the questionnaire had been properly encoded and if either of the variables were included, McCleskey's aggravation index would have increased, although the court is unable to say to what degree. Judging from GW 8, if that particular factor had a coefficient as great as .15, the 39-variable or "mid-range" model would not have demonstrated any disparity in sentencing rates as a function of the race of the victim.

Katz conducted an experiment aimed at determining whether the uncertainty in

---

12. This model has only one strength of the evidence factor (DCONFESS) and that occurs only in 26 percent of the cases. Many other aggravating and mitigating circumstances which the court has come to understand are significant in explaining the operation of the system in Georgia are omitted. Among these are that the homicide arose from a fight or that it was committed by lovers in a rage. A variable for family, lover, liquor, barroom quarrel is included, and it might be argued that this is a proxy. However, the court notes from DB 60 that the included variable occurs in only 1,246 cases whereas the excluded variable (MADLOVER) occurs in 1,601 cases. Therefore, the universe of cases is not coextensive. Others which are excluded are variables showing that the victim was forced to disrobe; that the victim was found without clothing; that the victim was mutilated; that the defendant killed in a rage; that the killing was unnecessary to carry out the contemporaneous felony; that the defendant was provoked; that the defendant lacked the intent to kill; that the defendant left the scene of the crime; that the defendant resisted arrest; and that the victim verbally provoked the defendant.

sentencing outcome in mid-range could be the result of imperfections of the model. He arbitrarily took the first 100 cases in the Procedural Reform Study. He then created five different models with progressively increasing numbers of variables. His six-variable model had an $r^2$ of .26. His 31-variable model had an $r^2$ of .95.[13] Using these regression equations he computed the predictive outcome for each case using the aggravation index arrived at through his regression equations. As more variables were added, aggravation coefficients in virtually every case moved sharply toward 0 in life sentence cases and sharply toward 1 in death sentence cases. Respondent's Exhibit 40. In the five regression models designed by Katz, McCleskey's aggravation score, depending on the number of independent variables included, was .70, .75, 1.03, .87, and .85. R 1734, Res.Exh. 40.

*Based on the foregoing the court is not convinced that the liberation hypothesis is at work in the system under study. Further, the court is not convinced that even if the hypothesis was at work in the system generally that it would suggest that impermissible factors entered into the decision to impose the death penalty upon McCleskey.*

On another subject, Baldus testified that in a highly decentralized decision-making system it is necessary to the validation of a study to determine if the effects noted system-wide obtain when one examines the decisions made by the compartmentalized decision-makers. R 964–69. An analysis was done to determine if the racial disparities would persist if decisions made by urban decision-makers were compared with decisions made by rural decision-makers.[14] No statistically significant race of the victim or race of the defendant effect was observed in urban decision-making units. A .08 effect, significant at the .05 level,

was observed for race of the victim in rural decision-making units, but when logistic regression analysis was used, the effect became statistically insignificant. The race of the defendant effect in the rural area was not statistically significant. The decisions in McCleskey's case were made by urban decision-makers.

Finally, the court makes the following findings with reference to some of the other models utilized by petitioner's experts. As noted earlier some were developed through a procedure called stepwise regression. What stepwise regression does is to screen the variables that are included in the analysis and include those variables which make the greatest net contribution to the $r^2$. The computer program knows nothing about the nature of those variables and is not in a position to evaluate whether or not the variable logically would make a difference. If the variables are highly correlated, the effect quite frequently is to drop variables which should not be dropped from a subject matter or substantive point of view and keep variables in that make no sense conceptually. So, stepwise regression can present a very misleading picture through the presentation of models which have relatively high $r^2$ and have significant coefficients but which models do not really mean anything. R 1652. *Because of this the court cannot accord any weight to any evidence produced by the model created by stepwise regression.*

Woodworth conducted a number of tests on five models to determine if his measures of statistical significance were valid. As there were no validations of the models he selected and none can fairly be said on the basis of the evidence before the court to model the criminal justice system in Georgia, Woodworth's diagnostics provide little if any corroboration to the findings produced by such models. R 1252, *et seq.*, GW 4, Table 1.

---

**13.** Katz testified that in most cases he randomly selected variables and in the case of the 31-variable model selected those variables arbitrarily which would most likely predict the outcome in McCleskey's case.

**14.** Based on the court's knowledge of the State of Georgia, it appears that Baldus included many distinctly rural jurisdictions in the category of urban jurisdictions.

In Exhibits DB 96 and DB 97, outcomes which indicate racial disparities at the level of prosecutorial decision-making and jury decision-making are displayed. At the hearing the court had thought that the column under the Charging and Sentencing Study might be the product of a model which controlled for sufficient background variables to make it partially reliable. Since the hearing the court has consulted Schedule 8 of the Technical Appendix (DB 96A) and has determined that only eleven background variables have been controlled for, and many significant background variables are omitted from the model. The other models tested in DB 96 and 97 are similarly under-inclusive. (In this respect compare the variables listed on Schedule 8 through 13, inclusive, of the Technical Appendix with the variables listed in DB 59.) For this reason the court is of the opinion that DB 96 and DB 97 are probative of nothing.

### 10. *The Fulton County Data.*

McCleskey was charged and sentenced in Fulton County, Georgia.[15] Recognizing that the impact of factors, both permissible and impermissible, do vary with the decision-maker, and recognizing that some cases in this circuit have required that the statistical evidence focus on the decisions where the sentence was imposed, petitioner's experts conducted a study of the effect of racial factors on charging and sentencing in Fulton County.

The statistical evidence on the impact of racial variables is inconclusive. If one controls for 40 or 50 background variables, multiple regression analysis does not produce any statistically significant evidence of either a race of the defendant or race of the victim disparity in Fulton County. R 1000. Baldus used a stepwise regression analysis in an effort to determine racial disparities at different stages of the criminal justice system in the county. The stepwise regression procedure selected 23 vari-

ables. Baldus made no judgment at all concerning the appropriateness of the variables selected by the computer. The study indicated a statistically significant race of the victim and race of the defendant effect at the plea bargaining stage and at the stage where the prosecutor made the decision to advance the case to a penalty trial. Overall, there was no statistically significant evidence that the race of the victim or race of the defendant played any part in who received the death penalty and who did not. As a matter of fact, the coefficients for these two variables were very modestly negative which would indicate a higher death sentencing rate in black-victim cases and in white-defendant cases. Neither of the coefficients, however, approach statistical significance. R 1037-49.

The same patterns observed earlier with reference to the relative aggravation and mitigation of white and black-victim cases, respectively, continue when the Fulton County data is reviewed. In Fulton County, as was the case statewide, cases in which black defendants killed white victims seemed to be more aggravated than cases in which white defendants killed white victims. R 1554, 1561, Res.Exh. 68.

Based on DB 114 and a near neighbor analysis, Baldus offered the opinion that in cases where there was a real risk of a death penalty one could see racial effects. R 1049-50. DB 114 is statistically inconclusive so far as the court can determine. The cohort study or near neighbor analysis also does not offer any support for Baldus's opinion. Out of the universe of cases in Fulton County Baldus selected 32 cases that he felt were near neighbors to McCleskey. These ran the gambit from locally notorious cases against Timothy Wes McCorquodale, Jack Carlton House, and Marcus Wayne Chennault, to cases that were clearly not as aggravated as McCleskey's case. Baldus then divided these 32

---

**15.** As part of its findings on the Fulton County data, the court finds that there are no guidelines in the Office of the District Attorney of the Atlanta Judicial Circuit to guide the exercise of discretion in determining whether or not to seek a penalty trial. Further, it was established that there was only one black juror on McCleskey's jury. R 1316.

cases into three groups: More aggravated, equal to McCleskey, and less aggravated.

The court has studied the cases of the cohorts put in the same category as McCleskey and cannot identify either a race of the victim or race of the defendant disparity. All of the cases involve a fact pattern something like McCleskey's case in that the homicides were committed during the course of a robbery and in that the cases involve some gratuitous violence, such as multiple gunshots, etc. Except in one case, the similarities end there, and there are distinctive differences that can explain why either no penalty trial was held or no death sentence was imposed.

As noted above, Dr. Baldus established that the presence of the B10 factor, that is that the homicide was committed to stop or avoid an arrest, had an important predictive effect on the imposition of the death penalty. Also, the fact that the victim was a police officer had some predictive effect. Keeping these thoughts in mind, we turn to a review of the cases. Defendant Thornton's case (black defendant/black victim) did not involve a police officer. Further, Thornton was very much under the influence of drugs at the time of the homicide and had a history of a "distinct alcohol problem." In Dillard's case (black defendant/black victim) the homicide was not necessary to prevent an arrest and the victim was not a police officer. Further, Dillard's prior record was less serious than McCleskey's. In Leach's case (black defendant/black victim) the homicide was not committed to prevent an arrest and the victim was not a police officer. Further, Leach had only one prior felony and that was for motor vehicle theft. Leach went to trial and went through a penalty trial. Nowhere in the coder's summary is there any information available on Leach's defense or on any evidence of mitigation offered.

In the case of Gantt (black defendant/white victim) the homicide was not committed to avoid an arrest and the victim was not a police officer. Further, Gantt relied on an insanity defense at trial and had only one prior conviction. Crouch's case (white defendant/white victim) did not involve a homicide committed to prevent an arrest and the victim was not a police officer. Crouch's prior record was not as severe as McCleskey's and, unlike McCleskey, Crouch had a prior history of treatment by a mental health professional and had a prior history of habitual drug use. Further, and importantly, the evidence contained in the summary does not show that Crouch caused the death of the victim.

Arnold is a case involving a black defendant and a white victim. The facts are much the same as McCleskey's except that the victim was not a police officer but was a storekeeper. Arnold's case is aggravated by the fact that in addition to killing the victim, he shot at three bystander witnesses as he left the scene of the robbery, and he and his co-perpetrators committed another armed robbery on that day. Arnold was tried and sentenced to death. Henry's case (black defendant/white victim) did not involve a homicide to escape an arrest or a police victim. Henry's prior record was not as serious as McCleskey's, and, from the summary, it would appear that there was no direct evidence that the defendant was the triggerman, nor that the State considered him to be the triggerman.

In sum, it would seem to the court that Arnold and McCleskey's treatments were proportional and that their cases were more aggravated and less mitigated than the other cases classified by Baldus as cohorts. This analysis does not show any effect based either upon race of the defendant or race of the victim. *See generally* R 985–99, DB 110.

Another type of cohort analysis is possible using Fulton County data. There were 17 defendants charged in connection with the killing of a police officer since *Furman*. Six of those in Baldus's opinion were equally aggravated to McCleskey's case. Four of the cases involved a black defendant killing a white officer; two involved a black defendant killing a black officer; and one involved a white defendant killing a white officer. There were two penalty trials. McCleskey's involved a

black defendant killing a white officer; the other penalty trial involved a black defendant killing a black officer. Only McCleskey received a death sentence. Three of the offenders pled guilty to murder, and two went to trial and were convicted and there was no penalty trial. *On the basis of this data and taking the liberation hypothesis into account, Baldus expressed the opinion that a racial factor could have been considered, and that factor might have tipped the scales against McCleskey.* R 1051–56, DB 116. *The court considers this opinion unsupported conjecture by Baldus.*

### D. Conclusions of Law

Based upon the legal premises and authorities set out above the court makes these conclusions of law.

The petitioner's statistics do not demonstrate a prima facie case in support of the contention that the death penalty was imposed upon him because of his race, because of the race of the victim, or because of any Eighth Amendment concern. Except for analyses conducted with the 230-variable model and the 250-variable model, none of the other models relied upon by the petitioner account to any substantial degree for racially neutral variables which could have produced the effect observed. The state-wide data does not indicate the likelihood of discriminatory treatment by the decision-makers who sought or imposed the death penalty and the Fulton County data does not produce any statistically significant evidence on a validated model nor any anecdotal evidence that race of the victim or race of the defendant played any part in the decision to seek or impose the death penalty on McCleskey.

The data base for the studies is substantially flawed, and the methodology utilized is incapable of showing the result of racial variables on cases similarly situated. Further, the methods employed are incapable of disclosing and do not disclose quantitatively the effect, if any, that the two suspect racial variables have either state-wide, county-wide or in McCleskey's case. Accordingly, a court would be incapable of discerning the degree of disparate treatment if there were any. Finally, the largest models utilized are insufficiently predictive to give adequate assurances that the presence of an effect by the two racial variables is real.

Even if it were assumed that McCleskey had made out a prima facie case, the respondent has shown that the results are not the product of good statistical methodology and, further, the respondent has rebutted any prima facie case by showing the existence of another explanation for the observed results, i.e., that white victim cases are acting as proxies for aggravated cases and that black victim cases are acting as proxies for mitigated cases. Further rebuttal is offered by the respondent in its showing that the black-victim cases being left behind at the life sentence and voluntary manslaughter stages, are less aggravated and more mitigated than the white-victim cases disposed of in similar fashion.

Further, the petitioner has failed to carry his ultimate burden of persuasion. Even in the state-wide data, there is no consistent statistically significant evidence that the death penalty is being imposed because of the race of the defendant. A persistent race of the victim effect is reported in the state-wide data on the basis of experiments performed utilizing models which do not adequately account for other neutral variables. These tables demonstrate nothing. When the 230-variable model is utilized, a race of the victim and race of the defendant effect is demonstrated. When all of the decisions made throughout the process are taken into account it is theorized but not demonstrated that the point in the system at which these impermissible considerations come into play is at plea bargaining. The study, however, is not geared to, nor does it attempt to control for other neutral variables to demonstrate that there is unfairness in plea bargaining with black defendants or killers of white victims. In any event, the petitioner's study demonstrates that at the two levels of the system that matter to him, the decision to seek the

death penalty and the decision to impose the death penalty, there is no statistically significant evidence produced by a reasonably comprehensive model that prosecutors are seeking the death penalty or juries are imposing the death penalty because the defendant is black or the victim is white. Further, the petitioner concedes that his study is incapable of demonstrating that he, specifically, was singled out for the death penalty because of the race of either himself or his victim. Further, his experts have testified that neither racial variable preponderates in the decision-making and, in the final analysis, that the seeking or the imposition of the death penalty depends on the presence of neutral aggravating and mitigating circumstances. For this additional reason, the court finds that even accepting petitioner's data at face value, he has failed to demonstrate that racial considerations caused him to receive the death penalty.

For these, among other, reasons the court denies the petition for a writ of habeas corpus on this issue.

## III. CLAIM "A"—THE GIGLIO CLAIM.

Petitioner asserts that the failure of the State to disclose an "understanding" with one of its key witnesses regarding pending criminal charges violated petitioner's due process rights. In *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1971) the Supreme Court stated:

As long ago as *Mooney v. Holohan*, 294 U.S. 103, 112 [55 S.Ct. 340, 341, 79 L.Ed. 791] (1935), this Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with "rudimentary demands of justice." This was reaffirmed in *Pyle v. Kansas*, 317 U.S. 213 [63 S.Ct. 177, 87 L.Ed. 214] (1942). In *Napue v. Illinois*, 360 U.S. 264 [79 S.Ct. 1173, 3 L.Ed.2d 1217] (1959), we said, "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.*, at 269 [79 S.Ct. at

1177]. Thereafter *Brady v. Maryland*, 373 U.S. [83], at 87 [83 S.Ct. at 1194, 10 L.Ed.2d 215], held that suppression of material evidence justifies a new trial "irrespective of the good faith or bad faith of the prosecution." *See* American Bar Association, Project on Standards for Criminal Justice, Prosecution Function and the Defense Function § 3.11(a). When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within this general rule. 405 U.S. 150, 153–54, 92 S.Ct. 763, 765–66, 31 L.Ed.2d 104.

In *Giglio* an Assistant United States Attorney had promised leniency to a co-conspirator in exchange for his testimony against defendant. However, the Assistant U.S. Attorney who handled the case at trial was unaware of this promise of leniency and argued to the jury that the witness had "received no promises that he would not be indicted." The Supreme Court held that neither the Assistant's lack of authority nor his failure to inform his superiors and associates was controlling. The prosecution's duty to present all material evidence to the jury was not fulfilled and thus constituted a violation of due process requiring a new trial. *Id.* at 150, 92 S.Ct. at 763.

■ It is clear from *Giglio* and subsequent cases that the rule announced in *Giglio* applies not only to traditional deals made by the prosecutor in exchange for testimony but also to any promises or understandings made by any member of the prosecutorial team, which includes police investigators. *See United States v. Antone*, 603 F.2d 566, 569 (5th Cir.1979) (*Giglio* analysis held to apply to understanding between investigators of the Florida Department of Criminal Law Enforcement and the witness in a federal prosecution). The reason for giving *Giglio* such a broad reach is that the *Giglio* rule is designed to do more than simply prevent prosecutorial misconduct. It is also a rule designed to insure the integrity of the truth-seeking process. As the Fifth Circuit stated in *United States v. Cawley*, 481 F.2d 702 (5th Cir.1973), "[w]e read *Giglio*

and [*United States v.*] *Tashman and Goldberg* (sic) [478 F.2d 129 (5th Cir., 1973)] to mean simply that the jury must be apprised of any promise which induces a key government witness to testify on the government's behalf." *Id.* at 707. More recently, the Eleventh Circuit has stated:

> The thrust of *Giglio* and its progeny has been to ensure that the jury know the facts that might motivate a witness in giving testimony, and that the prosecutor not fraudulently conceal such facts from the jury. We must focus on "the impact on the jury." *Smith v. Kemp,* 715 F.2d 1459, 1467 (11th Cir.1983) (quoting *United States v. Anderson,* 574 F.2d 1347, 1356 (5th Cir.1978)).

In the present case the State introduced at petitioner's trial highly damaging testimony by Offie Gene Evans, an inmate of Fulton County Jail, who had been placed in solitary confinement in a cell adjoining petitioner's. Although it was revealed at trial that the witness had been charged with escaping from a federal halfway house, the witness denied that any deals or promises had been made concerning those charges in exchange for his testimony.[16] The jury was clearly left with the impression that Evans was unconcerned about any charges which were pending against him and that no promises had been made which would affect his credibility. However, at petitioner's state habeas corpus hearing Evans testified that one of the detectives investigating the case had promised to speak to federal authorities on his behalf.[17] It was further revealed that the escape charges pending against Evans were dropped subsequent to McCleskey's trial.

▮ After hearing the testimony, the habeas court concluded that the mere *ex parte* recommendation by the detective did not trigger the applicability of *Giglio*. This, however, is error under *United States v. Antone,* 603 F.2d 566, 569 (5th Cir.1979) and cases cited therein. A promise, made prior to a witness's testimony, that the investigating detective will speak

---

16. On direct examination the prosecutor asked:

> Q: Mr. Evans have I promised you anything for testifying today?
> A: No, sir, you ain't.
> Q: You do have an escape charge still pending, is that correct?
> A: Yes, sir. I've got one, but really it ain't no escape, what the peoples out there tell me, because something went wrong out there so I just went home. I stayed at home and when I called the man and told him that I would be a little late coming in, he placed me on escape charge and told me there wasn't no use of me coming back, and I just stayed on at home and he come and picked me up.
> Q: Are you hoping that perhaps you won't be prosecuted for that escape?
> A: Yeah, I hope I don't, but I don't—what they tell me, they ain't going to charge me with escape no way.
> Q: Have you asked me to try to fix it so you wouldn't get charged with escape?
> A: No, sir.
> Q: Have I told you I would try to fix it for you?
> A: No, sir.
> Trial Transcript at 868.
> On cross-examination by petitioner's trial counsel Mr. Evans testified:
> Q: Okay. Now, were you attempting to get your escape charges altered or at least worked out, were you expecting your testimony to be helpful in that?

> A: I wasn't worrying about the escape charge. I wouldn't have needed this for that charge, there wasn't no escape charge.

> . . . . .

> Q: Those charges are still pending against you, aren't they?
> A: Yeah, the charge is pending against me, but I ain't been before no Grand Jury or nothing like that, not yet.
> Trial Transcript at 882.

17. At the habeas hearing the following transpired:

> The Court: Mr. Evans, let me ask you a question. At the time that you testified in Mr. McCleskey's trial, had you been promised anything in exchange for your testimony?
> The Witness: No, I wasn't. I wasn't promised nothing about—I wasn't promised nothing by the D.A. But the Detective told me that he would—he said he was going to do it himself, speak a word for me. That was what the Detective told me.
> By Mr. Stroup:
> Q: The Detective told you that he would speak a word for you?
> A: Yeah.
> Q: That was Detective Dorsey?
> A: Yeah.
> Habeas Transcript at 122.

favorably to federal authorities concerning pending federal charges is within the scope of *Giglio* because it is the sort of promise of favorable treatment which could induce a witness to testify falsely on behalf of the government. Such a promise of favorable treatment could affect the credibility of the witness in the eyes of the jury. As the court observed in *United States v. Barham*, 595 F.2d 231 (5th Cir.1979), *cert. denied*, 450 U.S. 1002, 101 S.Ct. 1711, 68 L.Ed.2d 205, the defendant is "entitled to a jury that, before deciding which story to credit, was truthfully apprised of any possible interest of *any* Government witness in testifying falsely." *Id.* at 243 (emphasis in original).

A finding that the prosecution has given the witness an undisclosed promise of favorable treatment does not necessarily warrant a new trial, however. As the Court observed in *Giglio:*

> We do not, however, automatically require a new trial whenever "a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict...." *United States v. Keogh*, 391 F.2d 138, 148 (C.A. 2 1968). A finding of materiality of the evidence is required under *Brady, supra*, at 87. A new trial is required if "the false testimony could ... in any reasonable likelihood have affected the judgment of the jury ...." 405 U.S. at 154, 92 S.Ct. at 766.

In *United States v. Anderson*, 574 F.2d 1347 (5th Cir.1978), the court elaborated upon the standard of review to be applied in cases involving suppression of evidence impeaching a prosecution witness:

The reviewing court must focus on the impact on the jury. A new trial is necessary when there is any reasonable likelihood that disclosure of the truth would have affected the judgment of the jury, that is, when there is a reasonable likelihood its verdict might have been different. We must assess both the weight of the independent evidence of guilt and the importance of the witness' testimony, which credibility affects. *Id.* at 1356.

In other cases the court has examined the extent to which other impeaching evidence was presented to the jury to determine whether or not the suppressed information would have made a difference. *E.g., United States v. Antone*, 603 F.2d 566 (5th Cir.1979).

In the present case the testimony of Evans was damaging to petitioner in several respects. First, he alone of all the witnesses for the prosecution testified that McCleskey had been wearing makeup on the day of the robbery. Such testimony obviously helped the jury resolve the contradictions between the descriptions given by witnesses after the crime and their in-court identifications of petitioner. Second, Evans was the only witness, other than the codefendant, Ben Wright, to testify that McCleskey had admitted to shooting Officer Schlatt. No murder weapon was ever recovered. No one saw the shooting. Aside from the damaging testimony of Wright and Evans that McCleskey had admitted the shooting, the evidence that McCleskey was the triggerman was entirely circumstantial. Finally, Evans' testimony was by far the most damaging testimony on the issue of malice.[18]

 In reviewing all of the evidence presented at trial, this court cannot con-

---

18. In his closing argument to the jury the prosecutor developed the malice argument:

> He (McCleskey) could have gotten out of that back door just like the other three did, but he chose not to do that, he chose to go the other way, and just like Offie Evans says, it doesn't make any difference if there had been a dozen policemen come in there, he was going to shoot his way out. He didn't have to do that, he could have run out the side entrance, he could have given up, he could have concealed

> himself like he said he tried to do under one of the couches and just hid there. He could have done that and let them find him, here I am, peekaboo.
> He deliberately killed that officer on purpose. I can guess what his purpose was, I am sure you can guess what it was, too. He is going to be a big man and kill a police officer and get away with it. That is malice.
> Trial Transcript at 974–75.

clude that had the jury known of the promise made by Detective Dorsey to Offie Evans, that there is any reasonable likelihood that the jury would have reached a different verdict on the charges of armed robbery. Evans's testimony was merely cumulative of substantial other testimony that McCleskey was present at the Dixie Furniture Store robbery. However, given the circumstantial nature of the evidence that McCleskey was the triggerman who killed Officer Schlatt and the damaging nature of Evans's testimony as to this issue and the issue of malice, the court does find that the jury may reasonably have reached a different verdict on the charge of malice murder had the promise of favorable treatment been disclosed. The court's conclusion in this respect is bolstered by the fact that the trial judge, in charging the jury as to murder, instructed the jury that they could find the defendant guilty of either malice murder or felony murder. After approximately two hours of deliberation, the jury asked the court for further instructions on the definition of malice. Given the highly damaging nature of Evans's testimony on the issue of malice, there is a reasonable likelihood that disclosure of the promise of favorable treatment to Evans would have affected the judgment of the jury on this issue.[19]

As the Fifth Circuit observed in *United States v. Barham,* 595 F.2d 231 (5th Cir.), *cert. denied,* 450 U.S. 1002, 101 S.Ct. 1711, 68 L.Ed.2d 205 (1981), another case involving circumstantial evidence bolstered by the testimony of a witness to whom an undisclosed promise of favorable treatment had been given:

> There is no doubt that the evidence in this case was sufficient to support a verdict of guilty. But the fact that we would sustain a conviction untainted by the false evidence is not the question. After all, we are not the body which, under the Constitution, is given the responsibility of deciding guilt or innocence. The jury is that body, and, again under the Constitution, the defendant is entitled to a jury that is not laboring under a Government-sanctioned false impression of material evidence when it decides the question of guilt or innocence with all its ramifications.
>
> We reiterate that credibility was especially important in this case in which two sets of witnesses—all alleged participants in one or more stages of a criminal enterprise—presented irreconcilable stories. Barham was entitled to a jury that, before deciding which story to credit, was truthfully apprised of any possible interest of *any* Government witness in testifying falsely. Knowledge of the Government's promises to Joey Shaver and Diane and Jerry Beech would have given the jury a concrete reason to believe that those three witnesses might have fabricated testimony in order to avoid prosecution themselves or minimize the adverse consequences of prosecution.... And the subsequent failure of the Government to correct the false impression given by Shaver and the Beeches shielded from jury consideration yet another, more persuasive reason to doubt their testimony—the very fact that they had attempted to give the jury a false impression concerning promises from the Government. In this case, in which credibility weighed so heavily in the balance, we cannot conclude that the jury, had it been given a specific reason to discredit

---

**19.** Although petitioner has not made this argument, the court notes in passing that Evans' testimony at trial regarding the circumstances of his escape varies markedly from the facts appearing in the records of federal prison authorities. For example, the records show that Evans had been using cocaine and opium immediately prior to and during his absence from the halfway house. Petitioner's Exhibit D, filed June 25, 1982. Also, prison records show that upon being captured Evans told authorities he had been in Florida working undercover in a drug investigation. Petitioner's Exhibit E, filed June 25, 1982. These facts, available to the prosecutorial team but unknown to the defense, contradict Evans' belittling of his escape. *See* Note 1, *supra.* The prosecution allowed Evans' false testimony to go uncorrected, and the jury obtained a materially false impression of his credibility. Under these circumstances the good faith or bad faith of the prosecution is irrelevant. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963); *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

the testimony of these key Government witnesses, would still have found that the Government's case and Barham's guilt had been established beyond a reasonable doubt. *Id.* at 242–43 (emphasis in original).

Because disclosure of the promise of favorable treatment and correction of the other falsehoods in Evans' testimony could reasonably have affected the jury's verdict on the charge of malice murder, petitioner's conviction and sentence on that charge are unconstitutional.[20] The writ of habeas corpus must therefore issue.

## IV. CLAIM "C"—THE *SANDSTROM* CLAIM.

Petitioner claims that the trial court's instructions to the jury deprived him of due

20. Nothing the court says in this part of the opinion is meant to imply that petitioner's confinement for consecutive life sentences on his armed robbery convictions is unconstitutional. The court holds only that the conviction and sentence for murder are unconstitutional.

21. The relevant portions of the trial court's jury instructions are set forth below. The portions to which petitioner objects are underlined.

> Now, the defendant enters upon the trial of this case, of all three charges set forth in the indictment, with the presumption of innocence in his behalf, and that presumption remains with him throughout the trial of the case unless and until the State introduces evidence proving the defendant's guilt of one or more or all of the charges beyond a reasonable doubt.
>
> The burden rests upon the state to prove the case by proving the material allegations of each count to your satisfaction and beyond a reasonable doubt. In determining whether or not the state has carried that burden you would consider all the evidence that has been introduced here before you during the trial of this case.
>
> . . . . .
>
> Now, in every criminal prosecution, ladies and gentlemen, criminal intent is a necessary and material ingredient thereof. To put it differently, a criminal intent is a material and necessary ingredient in any criminal prosecution.
>
> I will now try to explain what the law means by criminal intent by reading you two sections of the criminal code dealing with intent, and I will tell you how the last section applies to you, the jury.
>
> One section of our law says that the acts of a person of sound mind and discretion are

process because they unconstitutionally relieved the prosecution of its burden of proving beyond a reasonable doubt each and every essential element of the crimes for which defendant was convicted. Specifically, petitioner objects to that portion of the trial court's charge which stated:

> One section of our law says that the acts of a person of sound mind and discretion are presumed to be the product of the person's will, and a person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts, but both of these presumptions may be rebutted.[21] Trial Transcript at 996.

■■■■■ It is now well established that the due process clause "protects the accused against conviction except upon proof

> presumed to be the product of the person's will, and a person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts, but both of these presumptions may be rebutted.
>
> I charge you, however, that a person will not be presumed to act with criminal intention, but the second code section says that the trier of facts may find such intention upon consideration of the words, conduct, demeanor, motive and all other circumstances connected with the act for which the accused is prosecuted.
>
> Now, that second code section I have read you as the term the trier of facts. In this case, ladies and gentlemen, you are the trier of facts, and therefore it is for you, the jury, to determine the question of facts solely from your determination as to whether there was a criminal intention on the part of the defendant, considering the facts and circumstances as disclosed by the evidence and deductions which might reasonably be drawn from those facts and circumstances.
>
> . . . . .
>
> Now, the offense charged in Count One of the indictment is murder, and I will charge you what the law says about murder.
>
> I charge you that a person commits murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being. Express malice is that deliberate intention to take away the life of a fellow creature which is manifested by external circumstances capable of proof. Malice shall be implied when no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart. That is the language of the law, ladies and gentlemen.

beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). Jury instructions which relieve the prosecution of this burden or which shift to the accused the burden of persuasion on one or more elements of the crime are unconstitutional. *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

■ In analyzing a *Sandstrom* claim the court must first examine the crime for which the petitioner has been convicted and then examine the complained-of charge to determine whether the charge unconstitutionally shifted the burden of proof on any essential element of the crime. *See Lamb v. Jernigan*, 683 F.2d 1332, 1335–36 (11th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983). If the reviewing court determines that a reasona-ble juror would have understood the instruction either to relieve the prosecution of its burden of proof on an essential element of the crime or shift to the defendant the burden of persuasion on that element the conviction must be set aside unless the reviewing court can state that the error was harmless beyond a reasonable doubt. *Lamb v. Jernigan, supra; Mason v. Balkcom*, 669 F.2d 222 (5th Cir. Unit B 1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983).[22]

■ Petitioner was convicted of armed robbery and malice murder. The offense of armed robbery under Georgia law contains three elements: (1) A taking of property from the person or the immediate presence of a person, (2) by use of an offensive weapon, (3) with intent to commit theft.[23] The offense of murder also contains three essential elements: (1) A homicide; (2) malice aforethought; and (3) unlawfulness.[24] *See Lamb v. Jernigan, su-*

---

I charge you that legal malice is not necessarily ill-will or hatred. It is the intention to unlawfully kill a human being without justification or mitigation, which intention, however, must exist at the time of the killing as alleged, but it is not necessary for that intention to have existed for any length of time before the killing.

In legal contemplation a man may form the intention to kill a human being, do the killing instantly thereafter, and regret the deed as soon as it is done. In other words, murder is the intentional killing of a human being without justification or mitigation.

Trial Transcript, 988, 996–97, 998–99.

**22.** Whether a *Sandstrom* error can be held to be harmless remains an open question at this time. The Supreme Court expressly left open in *Sandstrom* the question of whether a burden-shifting jury instruction could ever be considered harmless. 442 U.S. at 526–27, 99 S.Ct. at 2460–61. The courts of this circuit have held that where the *Sandstrom* error is harmless beyond a reasonable doubt a reversal of the conviction is not warranted. *See, e.g., Lamb v. Jernigan*, 683 F.2d 1332, 1342–43 (11th Cir.1982). In *Connecticut v. Johnson*, —— U.S. ——, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983), the Supreme Court granted certiorari to resolve the question of whether a *Sandstrom* error could ever be considered harmless. Four Justices specifically held that the test of harmlessness employed by this circuit—whether the evidence of guilt was so overwhelming that the erroneous instruction could not have contributed to the jury's verdict—was

inappropriate. *Id.* 103 S.Ct. at 977. However, an equal number of justices dissented from this holding. *Id.* at 979 (Powell, J., joined by Burger, C.J., Rehnquist and O'Connor, J.J., dissenting). The tie-breaking vote was cast by Justice Stevens who concurred in the judgment on jurisdictional grounds. *Id.* at 978 (Stevens, J., concurring in the judgment).

Because a majority of the Supreme Court had not declared the harmless error standard employed in this circuit to be erroneous, the Eleventh Circuit has continued to hold that *Sandstrom* errors may be analyzed for harmlessness. *See Spencer v. Zant*, 715 F.2d 1562 (11th Cir. 1983).

**23.** Georgia Code Ann. § 26–1902 (now codified at O.C.G.A. § 16–8–41) provides in pertinent part:

(a) A person commits armed robbery when, with intent to commit theft, he takes property of another from the person or the immediate presence of another by use of an offensive weapon.

**24.** Georgia Code Ann. § 26–1101 (now codified at O.C.G.A. § 16–5–1) defines the offense of murder as follows:

(a) A person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being.

(b) Express malice is that deliberate intention unlawfully to take away the life of a fellow

*pra; Holloway v. McElroy,* 632 F.2d 605, 628 (5th Cir.1980), *cert. denied,* 451 U.S. 1028, 101 S.Ct. 3019, 69 L.Ed.2d 398 (1981). The malice element, which distinguishes murder from the lesser offense of voluntary manslaughter, means simply the intent to kill in the absence of provocation. In *Lamb v. Jernigan* the court concluded that "malice, including both the intent component and the lack of provocation or justification, is an essential element of murder under Ga.Code Ann. § 26–1101(a) that *Mullaney* and its progeny require the State to prove beyond a reasonable doubt." 683 F.2d at 1337. Since the intent to commit theft is an essential element of the offense of armed robbery, the State must also prove this element beyond a reasonable doubt.

In analyzing the jury instructions challenged in the present case to determine whether they unconstitutionally shift the burden of proof on the element of intent, the court has searched for prior decisions in this circuit analyzing similar language. These decisions, however, provide little guidance for they reach apparently opposite results on virtually identical language. In *Sandstrom* the Supreme Court invalidated a charge which stated that "[t]he law presumes that a person intends the ordinary consequences of his acts," 442 U.S. at 513, 99 S.Ct. at 2453. The Court held that the jury could have construed this instruction as either creating a conclusive presumption of intent once certain subsidiary facts had been found or shifting to the defendant the burden of persuasion on the element of intent. The Court held both such effects unconstitutional. Like the instruction in *Sandstrom,* the instruction at issue in the present case stated that "the acts of a person of sound mind and discretion are presumed to be the product of the

person's will, and a person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts, but both of these presumptions may be rebutted." This presumption would appear on its face to shift the burden of persuasion to the defendant. It does not contain the permissive language (intent *"may* be presumed when it would be the natural and necessary consequence of the particular acts.") which the *Lamb* court ruled created only a permissive inference rather than a mandatory presumption. Rather, the instruction at issue here states that a person *is* presumed to intend the natural and probable consequences of his acts. On its face this instruction directs the jury to presume intent unless the defendant rebuts it. This would appear to be the sort of burden-shifting instruction condemned by *Sandstrom.* This conclusion is supported by *Franklin v. Francis,* 720 F.2d 1206 (11th Cir.1983) which held that language virtually identical to that involved in the present case [25] violated *Sandstrom.* In that case the court declared:

> This is a mandatory rebuttable presumption, as described in *Sandstrom,* since a reasonable juror could conclude that on finding the basic facts (sound mind and discretion) he must find the ultimate fact (intent for the natural consequences of an act to occur) unless the defendant has proven the contrary by an undefined quantum of proof which may be more than "some" evidence. 720 F.2d at 1210.

However, in *Tucker v. Francis,* 723 F.2d 1504 (11th Cir.1984) another panel of the Eleventh Circuit, including the author of the *Franklin* opinion, reviewed language identical to that in *Franklin* and concluded that it created no more than a permissive inference and did not violate *Sandstrom.* The court in *Tucker* relied upon the fact

creature which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart.

**25.** In *Franklin* the trial court charged the jury that:

[t]he acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts, but the presumption may be rebutted.
*Franklin v. Francis,* 720 F.2d at 1210.

that the trial judge instructed the jury in other parts of his charge that criminal intent was an essential element of the crime and was a fact to be determined by the jury. The court also focused on the fact that the charge also stated that "a person will not be presumed to act with criminal intention, but the trier of fact, that is you the jury, may find such intention upon consideration of the words, conduct, demeanor, motive and all other circumstances connected with the act for which the accused is prosecuted." *Tucker, supra,* at 1517. Examining the objectionable language in the context of the entire instruction under *Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), the court concluded that the instruction would not unconstitutionally mislead the jury as to the prosecution's burden of proof. *Tucker, supra,* at 1517. The problem with this reasoning is that the exact same instructions were contained in the charge given to the jury in *Franklin v. Francis.* See *Franklin v. Francis,* 720 F.2d at 1208 n. 2. This court can find no principled way of distinguishing between the charges at issue in *Franklin* and in *Tucker* and can discern no reason why the charge in *Franklin* would create a mandatory rebuttable presumption while the charge in *Tucker* would create only a permissive inference. The *Tucker* court did not explain this inconsistency and in fact did not even mention *Franklin.*

█ The charge at issue in the present case is virtually identical to those involved in *Franklin* and in *Tucker.* This court is bound to follow *Tucker v. Francis,* which is the latest expression of opinion on this subject by this circuit. The court holds that the instruction complained of in this case, taken in the context of the entire

charge to the jury, created only a permissive inference that the jury could find intent based upon all the facts and circumstances of the case and thus did not violate *Sandstrom. Tucker v. Francis, supra.*

█ Having held that the instruction was not unconstitutional under *Sandstrom,* there is no need to examine the issue of harmlessness. However, the court expressly finds that even if the challenged instructions violated *Sandstrom,* the error was harmless beyond a reasonable doubt. The jury had overwhelming evidence that petitioner was present at the robbery and that he was the only one of the robbers in the part of the store from which the shots were fired. The jury also had evidence that he alone of the robbers was carrying the type of weapon that killed Officer Schlatt. Finally, the jury had the testimony of Ben Wright and Offie Evans that McCleskey had not only admitted killing Officer Schlatt but had even boasted of his act. Looking at the totality of the evidence presented and laying aside questions of credibility which are the proper province of the jury, this court cannot conclude that there is any reasonable likelihood that the intent instruction, even if erroneous, contributed to the jury's decision to convict petitioner of malice murder and armed robbery. Petitioner's *Sandstrom* claim is, therefore, without merit.

## V. CLAIM "L"—PROSECUTORIAL MISCONDUCT AT THE SENTENCING PHASE.

█ In this claim petitioner argues that the Assistant District Attorney improperly referred to the appellate process during his arguments to the jury at the sentencing phase of petitioner's trial.[26] References to

---

**26.** The relevant portion of the prosecutor's argument to the jury in favor of the death penalty is set forth below:

Now, what should you consider as you are deliberating the second time here, and I don't know what you are going to consider.

I would ask you, however, to consider several things. Have you observed any remorse being exhibited during this trial by Mr. McCleskey? Have you observed any remorse exhibited while he was testifying?

Have you observed any repentance by Mr. McCleskey, either visually as you look at him now or during the trial or during the time that he testified? Has he exhibited to you any sorrow, both visually or during the time that he was testifying?

Have you seen any tears in his eyes for this act that he has done?

*I would also ask you to consider the prior convictions that you have had with you in the jury room, and particularly the one where he*

the appellate process are not *per se* unconstitutional unless on the record as a whole it can be said that it rendered the entire trial fundamentally unfair. *McCorquodale v. Balkcom*, 705 F.2d 1553, 1556 (11th Cir. 1983); *Corn v. Zant*, 708 F.2d 549, 557 (11th Cir.1983).

 The prosecutor's arguments in this case did not intimate to the jury that a death sentence could be reviewed or set aside on appeal. Rather, the prosecutor's argument referred to petitioner's prior criminal record and the sentences he had received. The court cannot find that such arguments had the effect of diminishing the jury's sense of responsibility for its deliberations on petitioner's sentence. Insofar as petitioner claims that the prosecutor's arguments were impermissible be-

cause they had such an effect, the claim is without merit.[27]

## VI. CLAIM "B"—TRIAL COURT'S REFUSAL TO PROVIDE PETITIONER WITH FUNDS TO RETAIN HIS OWN EXPERT WITNESS.

Petitioner contends that the trial court's refusal to grant funds for the employment of a ballistics expert to impeach the testimony of Kelley Fite, the State's ballistics expert, denied him due process. This claim is clearly without merit for the reasons provided in *Moore v. Zant*, 722 F.2d 640 (11th Cir.1983).

 Under Georgia law the appointment of an expert in a case such as this

*got three convictions. I believe if you look at those papers carefully you are going to find, I think, on one of those he got three life sentences to begin with, and then there is a cover sheet where apparently that was reduced to what, eighteen years or fifteen years or something, which means of course, he went through the appellate process and somehow got it reduced.*

Now, I ask you to consider that in conjunction with the life that he has set for himself. You know, I haven't set his goals, you haven't set his goals, he set his own goals, and here is a man that served considerable periods of time in prison for armed robbery, just like Ben Wright said, you know, that is his profession and he gets in safely, takes care of the victims, although he may threaten them, and gets out safely, that is what he considers doing a good job, but of course you may not agree with him, but that is job safety.

I don't know what the Health, Education and Welfare or whatever organization it is that checks on job safety would say, but that is what Mr. Ben Wright considers his responsibility.

Now, apparently Mr. McCleskey does not consider that his responsibility, so consider that. The life that he has set for himself, the direction he has set his sails, and thinking down the road, are we going to have to have another trial sometime for another peace officer, another corrections officer, or some innocent bystander who happens to walk into a store, or some innocent person who happens to be working in the store who makes the wrong move, who makes the wrong turn, that makes the wrong gesture, that moves suddenly and ends up with a bullet in their head?

This has not been a pleasant task for me, and I am sure it hasn't been a pleasant task for you. I would have preferred that some of the

other Assistants downstairs be trying this case, I would prefer some of the others be right here now instead of me, and I figure a lot of you are figuring why did I get on this jury, why not some of the other jurors, let them make the decision.

I don't know why you are here, but you are here and I have to be here. It has been unpleasant for me, but that is my duty. I have tried to do it honorably and I have tried to do it with justice. I have no personal animosity toward Mr. McCleskey, I have no words with him, I don't intend to have any words with him, but I intend to follow what I consider to be my duty, my honor and justice in this case, and I ask you to do the same thing, that you sentence him to die, and that you find aggravating circumstances, both of them, in this case.

Transcript at 1019–21.

27. Although the point has not been argued by either side and is thus not properly before the court, the prosecutor's arguments may have been impermissible on the grounds that they encouraged the jury to take into account the possibility that petitioner would kill again if given a life sentence. Such "future victims" arguments have recently been condemned by the Eleventh Circuit on the grounds that they encourage the jury to impose a sentence of death for improper or irrelevant reasons. *See Tucker v. Francis*, 723 F.2d 1504 (11th Cir.1984); *Brooks v. Francis*, 716 F.2d 780 (11th Cir.1983); *Hance v. Zant*, 696 F.2d 940 (11th Cir.1983). The court makes no intimation about the merits of such an argument and makes mention of it only for the purpose of pointing out that it has not been raised by fully competent counsel.

ordinarily lies within the discretion of the trial court. *See Whitaker v. State*, 246 Ga. 163, 269 S.E.2d 436 (1980). In this case the State presented an expert witness to present ballistics evidence that the bullet which killed Officer Schlatt was probably fired from a gun matching the description of the gun petitioner had stolen in an earlier robbery and which matched the description of the gun several witnesses testified the petitioner was carrying on the day of the robbery at the Dixie Furniture Company. Petitioner had ample opportunity to examine the evidence prior to trial and to subject the expert to a thorough cross-examination. Nothing in the record indicates that the expert was biased or incompetent. This court cannot conclude therefore that the trial court abused its discretion in denying petitioner funds for an additional ballistics expert.

### VII. CLAIM "D"—TRIAL COURT'S INSTRUCTIONS REGARDING USE OF EVIDENCE OF OTHER CRIMES AT GUILT STAGE OF PETITIONER'S TRIAL.

Petitioner claims that the trial court's instructions regarding the purposes for which the jury could examine evidence that petitioner had participated in other robberies for which he had not been indicted was overly broad and diminished the reliability of the jury's guilt determination.

During the trial the prosecution introduced evidence that petitioner had participated in armed robberies of the Red Dot Grocery Store and the Red Dot Fruit Stand. At that time the trial judge cautioned the jury that the evidence was admitted for the limited purpose of "aiding in the identification and illustrating the state of mind, plan, motive, intent and scheme of the accused, if in fact it does to the jury so do that." The evidence tended to establish

that petitioner had participated in earlier armed robberies employing the same modus operandi and that in one of these robberies he had stolen what was alleged to have been the weapon that killed Officer Schlatt. Such evidence is admissible under Georgia law. *See Hamilton v. State*, 239 Ga. 72, 235 S.E.2d 515 (1977). Petitioner objects that the trial court's instructions regarding the use of this evidence were overbroad because "(a) the prosecution itself had offered the evidence of other transactions for the purpose of showing the identity of the accused rather than to show intent or state of mind, and (b) it is irrational to instruct that evidence of an accused's participation in another transaction where a murder did not occur is probative of the accused's intent to commit malice murder." Petitioner's Memorandum of Law in Support of Issuance of the Writ at 10–11. Both of these contentions are without merit. First, the court sees nothing in the court's instructions to support petitioner's contention that the jury was allowed to find intent to commit malice murder from the evidence of the prior crimes. Petitioner was charged with armed robbery and murder. The evidence of the Red Dot Grocery Store robbery was admissible for the purpose of showing that petitioner had stolen the murder weapon. The evidence of the other armed robberies was admissible for the purpose of showing a common scheme or plan on the armed robbery count. Also, the evidence of the Red Dot Fruit Stand robbery was admitted for impeachment purposes only after the petitioner took the stand in his own defense. The court has read the trial court's instructions and cannot conclude that the instructions were overbroad or denied petitioner a fair trial. *See Spencer v. Texas*, 385 U.S. 554, 560–61, 87 S.Ct. 648, 651–52, 17 L.Ed.2d 606 (1967).[28]

---

**28.** The relevant portion of the trial judge's instructions to the jury were as follows:

Now, ladies and gentlemen, there was certain evidence that was introduced here, and I told you it was introduced for a limited purpose, and I will repeat the cautionary charge I gave you at that time.

I told you that in the prosecution of a particular crime, evidence which in any manner tends to show that the accused has committed another transaction, wholly distinct, independent and separate from that for which he is on trial, even though it may show a transaction of the same nature, with similar methods

VIII. CLAIM "E"—EVIDENCE OF NON–STATUTORY AGGRAVATING CIRCUMSTANCES PRESENTED AT PENALTY STAGE OF PETITIONER'S TRIAL.

█ Petitioner contends that the trial court erred by giving the jury complete, unlimited discretion to use any of the evidence presented at the trial during its deliberations regarding imposition of the death penalty. Petitioner's claim is without merit. The trial judge specifically instructed the jury that it could not impose the death penalty unless it found at least one statutory aggravating circumstance.[29] He also instructed the jury that if it found one or more statutory aggravating circumstances it could also consider any other mitigating or aggravating circumstances in determin-

ing whether or not the death penalty should be imposed.

Georgia's capital sentencing procedure has been declared constitutional by the Supreme Court in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Just recently the Supreme Court examined an argument similar to the one petitioner makes here in *Zant v. Stephens,* —— U.S. ——, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). In that case the Court dealt with the argument that allowing the jury to consider any aggravating circumstances once a statutory aggravating circumstance had been found allowed the jury unbridled discretion in determining whether or not to impose the death penalty on a certain class of defendants. The Court stated:

> Our cases indicate, then, that statutory aggravating circumstances play a consti-

---

and in the same localities, it is admitted into evidence for the limited purpose of aiding in identification and illustrating the state of mind, plan, motive, intent and scheme of the accused, if, in fact, it does to the jury so do that.

Now, whether or not this defendant was involved in such similar transaction or transactions is a matter for you to determine. Furthermore, if you conclude that the defendant was involved in this transaction or these transactions, you should consider it solely with reference to the mental state of the defendant insofar as it is applicable to the charges set forth in the indictment, and the court in charging you this principle of law in no way intimates whether such transaction or transactions, if any, tend to illustrate the state of mind or intent of the defendant or aids in identification, that is a matter for you to determine.

Transcript at 992–93.

**29.** The relevant portion of the judge's sentencing charge is printed below. The challenged portion is underlined.

I charge you that in arriving at your determination you must first determine whether at the time the crime was committed either of the following aggravating circumstances was present and existed beyond a reasonable doubt; one, that the offense of murder was committed while the offender was engaged in the commission of another capital felony, to wit, armed robbery; and two, the offense of murder was committed against any peace officer, corrections employee or fireman while engaged in the performance of his official duties.

Now, if you find one or both of these aggravating circumstances existed beyond a reasoanble doubt, upon consideration of the offense of murder, then you would be authorized to consider imposing a sentence of death relative to that offense.

If you do not find beyond a reasonable doubt that one of the two of these aggravating circumstances existed with reference to the offense of murder, then you would not be authorized to consider the penalty of death, and in that event the penalty imposed would be imprisonment for life as provided by law. In arriving at your determination of which penalty shall be imposed, you are authorized to consider all of the evidence received here in court, presented by the State and the defendant throughout the trial before you.

You should consider the facts and circumstances in mitigation. Mitigating circumstances are those which do not constitute a justification or excuse for the offense in question, but which in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability or blame.

⋅ ⋅ ⋅ ⋅ ⋅

Now, it is not mandatory that you impose the death penalty even if you should find one of the aggravating circumstances does exist or did exist. You could only impose the death penalty if you do find one of the two statutory aggravating circumstances I have submitted to you, but if you find one to exist or both of them to exist, it is not mandatory upon you to impose the death penalty.

Transcript, 1027–29.

tutionally necessary function at the stage of legislative definition: They circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death. What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime. *Zant v. Stephens,* —— U.S. ——, 103 S.Ct. at 2743–44 [77 L.Ed.2d 235] (emphasis in original).

The court specifically approved in *Zant v. Stephens* consideration by the jury of nonstatutory aggravating circumstances, provided that such evidence is not "constitutionally impermissible or totally irrelevant to the sentencing process, such as for example the race, religion or political affiliation of the defendant." *Id.* 103 S.Ct. at 2747.

The sentencing jury in this case found two statutory aggravating circumstances: (1) That the offense of murder had been committed while McCleskey was engaged in the commission of another capital felony; and (2) that the offense of murder was committed against a peace officer while engaged in the performance of his official duties. "The trial judge could therefore properly admit any 'additional evidence in extenuation, mitigation, and aggravation of punishment, including the record of any prior conviction,' ... provided that the evidence bore on 'defendant's prior record, or circumstances of his offense,' " *Moore v. Zant,* 722 F.2d 640 at 644 (11th Cir.1983)

(quoting *Lockett v. Ohio,* 438 U.S. 586, 604 n. 12, 98 S.Ct. 2954, 2965 n. 12, 57 L.Ed.2d 973 (1978)). For the reasons stated in *Zant v. Stephens, supra,* and *Moore v. Zant, supra,* petitioner's claim is without merit.

IX. CLAIM "F"—WHETHER THE ADMISSION AT PETITIONER'S TRIAL OF EVIDENCE CONCERNING PRIOR CRIMES AND CONVICTIONS VIOLATED PETITIONER'S DUE PROCESS RIGHTS.

Petitioner contends that the admission of evidence concerning two prior armed robberies for which he had not been indicted and the admission of details of other prior armed robberies for which he had been convicted violated his due process rights. This court has already concluded in Part VII, *supra,* that the evidence that petitioner participated in prior armed robberies was properly admitted to show petitioner's scheme, motive, intent or design and that the trial judge's instructions properly limited the use of this evidence. *See also McClesky v. State,* 245 Ga. 108, 114, 263 S.E.2d 146 (1980). The evidence to which petitioner objects most strongly in Claim "F" concerns *details* of prior armed robberies for which petitioner had been convicted. When petitioner took the stand in his own defense, he admitted on direct examination that he had previously been convicted of armed robbery. He admitted to being guilty of those crimes, gave the dates of the convictions and the sentences he had received. On cross-examination the Assistant District Attorney asked petitioner a number of questions concerning the details of those robberies.[30] Petitioner contends that this questioning concerning the

---

**30.** A portion of the cross-examination was as follows:

Q: Are you saying you were guilty or you were not guilty?
A: Well, I was guilty on this.
Q: Three counts of armed robbery?
A: Pardon me?
Q: You were guilty for the three counts of armed robbery?
A: Yes sir.
Q: How about the other two that you pled guilty to, were you guilty of those?

A: I was guilty on the Cobb County, but the others I was not guilty of, but I pleaded guilty to them anyway, because like I say, I didn't see no reason to go through a long process of fighting them, and I already had a large sentence.
Q: So you are guilty for the Douglas County armed robberies and the Cobb County robbery, but not the Fulton County robbery?
A: I pleaded guilty to it.
Q: To the Fulton County?
A: Sure.

details of crimes to which petitioner had admitted guilt exceeded the bounds of what was permissible for impeachment purposes, was irrelevant to the crimes for which he was being tried, and served to prejudice the jury against him. The Supreme Court of Georgia has already declared that this evidence was properly admitted under the Georgia Rules of Evidence. Petitioner asks this court now to declare the Georgia rule allowing the admissibility of this evidence to be violative of the due process clause of the Fourteenth Amendment.

Q: But are you guilty of that robbery?
A: I wasn't guilty of it, but I pleaded guilty to it.
Q: But you were guilty in all of the robberies in Cobb County and Douglas County, is that correct?
A: I have stated I am guilty for them, but for the ones in Fulton County, no, I wasn't guilty of it. I pleaded guilty to it because I didn't see no harm it could do to me.
Q: Now, one of those armed robberies in Douglas County, do you recall where that might have been?
A: You mean place?
Q: Yes, sir.
A: I know it was a loan company.
Q: Kennesaw Finance Company on Broad Street, is that about correct?
A: That sounds familiar.
Q: And did you go into that place of business at approximately closing time?
A: I would say yes.
Q: Did you tie the manager and the—the managers up?
A: No, I didn't do that. ·
Q: Did somebody tie them up?
A: Yes, sir.
Q: Did they curse those people?
A: Did they curse them? .
Q: Yes, sir.
A: Not to my recollection.
Q: Did they threaten to kill those people?
A: Not to my recollection.
Q: Did somebody else threaten to kill them?
A: I don't remember anybody making any threats. I vaguely remember the incident, but I don't remember any threats being issued out.
Q: Now, the robbery in Cobb County, do you remember where that might have been.
A: Yes, sir, that was at Kennesaw Finance, I believe.
Q: And do you remember what time of day that robbery took place?
A: If I am not mistaken, I think it was on the 23rd day of July.
Q: 1970?
A: Right.
Q: About 4:30 p.m.?

In *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the Supreme Court stated:

To insure that the death penalty is indeed imposed on the basis of "reason rather than caprice of emotion," we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination. The same reasoning must apply to rules that diminish the reliability of the guilt determination. *Id.* at 638, 100 S.Ct. at 2390.

A: Yes, sir.
Q: Were you found inside the store on the floor with a .32 caliber revolver?
A: Yes, sir, they caught me red-handed, I couldn't deny it.
Q: And did you arrive there with an automobile parked around the corner?
A: I didn't have an automobile.
Q: Did that belong to Harold McHenry?
A: McHenry had the automobile.
Q: And was he with you in the robbery?
A: Yes, sir.
Q: And was that automobile parked around the corner with the motor running?
A: At that time I don't know exactly where it was parked because I didn't get out right there around the corner, I got out of the street from the place and he was supposed to pick us up right there, but unfortunately he didn't make it.
Q: You also have been convicted out in DeKalb County, haven't you?
A: Yes, sir, I entered a plea out there. All of those charges stem from 1970.
Q: What did you plead guilty to out in DeKalb County?
A: Robbery charge.
Q: Armed robbery?
A: Yes, sir.
Q: And where was that at, sir?
A: I don't know—I don't remember exactly where the robbery was supposed to have took place, but I remember entering a guilty plea to it.
Q: Were you guilty of that?
A: No, sir, I wasn't guilty of it. Like I said, I had spent money on top of money trying to fight these cases and I didn't see any need to continue to fight cases and try to win them and I have already got a large sentence anyway.
Q: I believe the DeKalb County case was out at the Dixie Finance Company out in Lithonia, is that correct?
A: I don't really recollect. I do remember the charge coming out, but I don't recall exactly what place it was.
Transcript 845–849.

In *Beck* the Supreme Court struck down an Alabama statute which prohibited a trial judge from instructing the jury in a murder case that it could find the defendant guilty of a lesser-included offense. The Court ruled that this statute distorted the fact-finding function of the jury. "In the final analysis the difficulty with the Alabama statute is that it interjects irrelevant considerations into the factfinding process, diverting the jury's attention from the central issue of whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime." *Id.* at 642, 100 S.Ct. at 2392.

In *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) the Supreme Court set aside a death sentence on the grounds that the state trial court had excluded certain hearsay testimony at the sentencing portion of petitioner's trial. In that case the Court stated:

> Regardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause of the Fourteenth Amendment. *Id.* at 96, 99 S.Ct. at 2151.

It seems clear from these cases that a state procedural or evidentiary rule which might substantially diminish the reliability of the factfinding function of the jury in a capital case would violate the due process clause of the Fourteenth Amendment. The question, then, is whether or not the admissibility of the details of other crimes can be said to have had the effect of diminishing "the reliability of the guilt determination." Petitioner has cited several cases from this and other circuits which have held that the admission in a federal prosecution of details of prior crimes to which the defendant had admitted guilt was unfairly prejudicial and constituted reversible error. *See, e.g., United States v. Tumblin,* 551 F.2d 1001 (5th Cir.1977); *United States v. Harding,* 525 F.2d 84 (7th Cir.1975) ("The rule that it is error to inquire about the details of prior criminal conduct is so well established that such

error is cognizable despite the absence of any objection by defense counsel."). The point petitioner has overlooked is that prosecutions in federal court are governed by the Federal Rules of Evidence. Each of the cases petitioner has cited rely to a greater or lesser extent upon an interpretation of those rules. While the Federal Rules of Evidence embody a modern concept of fairness and due process, it is not for this court to say that they are the only embodiment of due process or the standard against which state rules of evidence must be judged. While the evidence presented at petitioner's trial would probably not have been admitted in a federal prosecution, this court cannot conclude that it was so seriously prejudicial that it undermined the reliability of the jury's guilt determination. Petitioner's Claim "F" is therefore without merit.

## X. CLAIM "M"—THE SUGGESTIVE LINEUP.

In this claim petitioner contends that he was shown to at least three witnesses for the State in an illegal and highly suggestive display immediately prior to his trial without the knowledge, consent, or presence of defense counsel. The Supreme Court of Georgia thoroughly addressed this concern and found against petitioner. *McClesky v. State,* 245 Ga. 108, 110–12, 263 S.E.2d 146 (1980). In its discussion the Supreme Court of Georgia stated:

> The record shows that four witnesses immediately prior to the call of the case saw the appellant and four other persons sitting in the jury box guarded by deputy sheriffs. Each of these witnesses testified that they recognized the appellant as one of the robbers at the time they saw him seated in the jury box. There is no indication that the witnesses were asked to view the man seated in the jury box and see if they recognized anyone. No one pointed out the appellant as the defendant in the case, rather it is apparent from the witnesses' testimony that each recognized the appellant from having viewed him at the scene of the respective

robberies. Therefore, no illegal post-indictment lineup occurred....

Appellant argues further that the four witnesses viewing him in the jury box as he awaited trial along with police identification procedures impermissibly tainted the witnesses' in-court identification of the appellant.

The threshold inquiry is whether the identification procedure was impermissibly suggestive. Only if it was, need the court consider the second question: Whether there was a substantial likelihood of irreparable misidentification.... The chance viewing of the appellant prior to trial as he sat with others was no more suggestive than seeing him in the hall as he and other defendants are being brought in for trial, or seeing him seated at the defense table as each witness comes in to testify. We conclude that the chance viewing of the appellant immediately prior to trial by four of the State's witnesses was not impermissibly suggestive. Also we find the identifications were not tainted by police identification procedures. 245 Ga. at 110, 263 S.E.2d 146.

Although the court found that the display was not impermissibly suggestive, the court went on to examine whether the in-court identifications were reliable and found that they were. This court finds no basis in the record or in the arguments presented by petitioner for concluding that the Supreme Court of Georgia was in error. The court therefore finds that petitioner's Claim "M" is without merit.

XI. CLAIM "N"—WHETHER PETITIONER'S STATEMENT INTRODUCED AT TRIAL WAS FREELY AND VOLUNTARILY GIVEN AFTER A KNOWING WAIVER OF PETITIONER'S RIGHTS.

■ In this claim petitioner contends that the admission at trial of his statements given to the police was error because the statements were not freely and voluntarily given after a knowing waiver of rights. Before the statement was revealed to the jury the trial court held, outside of the presence of the jury, a *Jackson v. Denno* hearing. The testimony at this hearing revealed that at the time he was arrested petitioner denied any knowledge of the Dixie Furniture Store robbery. He was detained overnight in the Marietta Jail. The next morning when two Atlanta police officers arrived to transfer him to Atlanta they advised him of his full *Miranda* rights. He again denied any knowledge of the Dixie Furniture Store robbery. There was some dispute about what was said during the half-hour trip back to Atlanta. Petitioner claimed that the officers told him that his co-defendants had implicated him and that if he did not start talking they would throw him out of the car. The officers, of course, denied making any such threat but did admit that they told petitioner that the other defendants were "trying to stick it on" him. The officers testified that during the trip back, after being fully advised of his *Miranda* rights and not being subjected to any coercion or threats, petitioner admitted his full participation in the robbery but denied that he shot Officer Schlatt.

Immediately upon arrival at the Atlanta Police Department petitioner was taken to Detective Jowers. At that time petitioner told Jowers that he was ready to talk. Detective Jowers had petitioner execute a written waiver of counsel. This waiver included full *Miranda* warnings and a statement that no threats or promises had been made to induce petitioner's signature. Petitioner's statement was then taken over the next several hours. During the first part of this session petitioner simply narrated a statement to a secretary who typed it. The secretary testified that petitioner was dissatisfied with the first draft of the statement and started another one. The first draft was thrown away.

After petitioner finished his narration Detective Jowers proceeded to ask him a number of questions about the crime. This questioning went on for some time off the record. Finally, a formal question and answer session was held on the record. These questions and answers were typed up by the secretary and signed by petitioner.

It is undisputed that the atmosphere in the room where the statement was being taken was unusually relaxed and congenial, considering the gravity of the crime of which petitioner was accused. The secretary who typed it testified that she had never seen the police officers treat a murder suspect with such warmth.[31]

After hearing all of the testimony and considering petitioner's argument that the police had engaged in a "Mutt and Jeff" routine,[32] the trial court ruled that the statement had been freely and voluntarily given after a knowing waiver of petitioner's *Miranda* rights. The jury was then returned and the statement and testimony were introduced.

After having read the transcript of the proceedings this court cannot conclude that the trial judge erred in his finding that the statement was freely and voluntarily given. There was no error, therefore, in admitting the statement into evidence. Petitioner's Claim "N" is therefore without merit.

**31.** The officers gave petitioner cigarettes, potato chips, and soft drinks during the interrogation. They also at one point discussed with him the attractiveness of a particular female officer.

**32.** Such routines involve one group of officers acting hostile and threatening toward the defendant while another officer or group of officers seemingly befriends him and showers him with kindness. The rationale for such routines is that defendants often believe they have found a friend on the police force to whom they can tell their story.

**33.** The examination of Miss Barbara J. Weston was as follows:
 Q: Now, Miss Weston, are you conscientiously opposed to capital punishment?
 A: Yes.
 Q: Your opposition towards capital punishment, would that cause you to vote against it regardless of what the facts of the case might be?
 A: Yes, I would say so, because of the doctrine of our church. We have a manual that we go by.
 Q: Does your church doctrine oppose capital punishment?
 A: Yes.
 Q: So you would oppose the imposition of capital punishment regardless of what the facts would be?

## XII. CLAIM "O"—EXCLUSION OF DEATH–SCRUPLED JURORS.

Petitioner claims that the exclusion of two prospective jurors because of their opposition to the death penalty violated his Sixth Amendment rights under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Both jurors indicated that they would not under any circumstances consider the death penalty.[33]

■ In *Witherspoon v. Illinois, supra,* the Supreme Court held that a person could not be sentenced to death by a jury from which persons who had moral reservations about the death penalty had been excluded, unless those persons had indicated that their opposition to the death penalty would prevent them from fulfilling their oaths as jurors to apply the law:

> [N]othing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would

 A: Yes.
 Q: You would not even consider that as one of the alternatives?
 A: No, I wouldn't.
 The Court: Mr. Turner, any questions you want to ask?
 Mr. Turner: No questions from me.
 The Court: Miss Weston, I will excuse you from this case.
Transcript 98–99.
 The testimony of Emma T. Cason was as follows:
 Q: Mrs. Cason, are you conscientiously opposed to capital punishment?
 A: Yes.
 Q: You are?
 A: Yes.
 Q: If you had two alternatives in a case as far as penalties go, that is, impose the death sentence or life penalty, could you at least consider the imposition of the death penalty?
 A: I don't think so, no. I would have to say no.
 Q: Under any circumstances you would not consider it?
 A: No.
 Mr. Parker: Thank you.
 The Court: Any questions?
 Mr. Turner: No questions.
 The Court: Mrs. Cason, I will excuse you and let you return to the jury assembly room on the fourth floor.
Transcript 129–30.

*automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.* 391 U.S. at 522–23 n. 21, 88 S.Ct. at 1776–77 n. 21 (emphasis in original).

Since the two prospective jurors in this case indicated that they would not under any circumstances vote for the death penalty, the trial court committed no error in excluding them. *See Boulden v. Holman,* 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969).

▉ Petitioner's argument that the exclusion of death-scrupled jurors violated his right to be tried by a jury drawn from a representative cross section of his community has already been considered and rejected in this circuit. *Smith v. Balkcom,* 660 F.2d 573, 582–83 (5th Cir. Unit B 1981), *cert. denied,* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982); *Spinkellink v. Wainwright,* 578 F.2d 582, 593–99 (5th Cir. 1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796, *reh'g denied,* 441 U.S. 937, 99 S.Ct. 2064, 60 L.Ed.2d 667 (1979). The Court in *Spinkellink* also rejected petitioner's claims that the exclusion of death-scrupled jurors resulted in a prosecution-prone jury or a jury that was incapable of maintaining "a link between contemporary community values and the penal system." 578 F.2d at 593–99. *See generally, Woodson v. North Carolina,* 428 U.S. 280, 295, 96 S.Ct. 2978, 2987, 49 L.Ed.2d 944 (1976).

Because the two prospective jurors indicated they would not consider the death penalty under any circumstances, they were properly excluded, and petitioner's Claim "O" is without merit.

## XIII. CLAIM "I"—PETITIONER'S CLAIM THAT THE DEATH PENALTY FAILS TO SERVE RATIONAL INTERESTS.

In his petition for the writ petitioner raised a claim that the death penalty fails to serve rational interests. Neither petitioner nor the State has briefed this issue, but the premise appears to be that the supposed deterrent value of the death penalty cannot be demonstrated; that executions set socially-sanctioned examples of violence; that public sentiment for retribution is not so strong as to justify use of the death penalty; and that no penal purpose is served by execution which cannot be more effectively served by life imprisonment. Such arguments are more properly addressed to the political bodies. *See Furman v. Georgia,* 408 U.S. 238, 410, 92 S.Ct. 2726, 2814, 33 L.Ed.2d 346 (1972) (Blackmun, J., dissenting). Georgia's death penalty was declared constitutional in *Gregg v. Georgia,* 428 U.S. 153, 183, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859 (1976). Petitioner's Claim "I" is therefore without merit.

## XIV. CLAIM "Q"—PETITIONER'S BRADY CLAIM.

Petitioner contends that prior to trial defense counsel filed a *Brady* motion seeking, *inter alia,* statements he was alleged to have been made and that the State failed to produce the statement that was alleged to have been made to Offie Evans while in the Fulton County Jail. Petitioner contends that this failure to produce the statement prior to trial entitles him to a new trial.

▉ *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) requires the prosecution to produce any evidence in its possession which would tend to be favorable or exculpatory to the defendant. However, *Brady* does not establish any right to pretrial discovery in a criminal case, but instead seeks only to insure the fairness of a defendant's trial and the reliability of the jury's determinations. *United States v. Beasley,* 576 F.2d 626 (5th Cir.1978), *cert. denied,* 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979). Thus, a defendant who seeks a new trial under *Brady* must meet three require-

ments to establish a successful claim: "(1) The prosecutor's suppression of the evidence, (2) the favorable character of the suppressed evidence for the defense, and (3) the materiality of the suppressed evidence." *Martinez v. Wainwright,* 621 F.2d 184 (5th Cir.1980); *United States v. Preston,* 608 F.2d 626, 637 (5th Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980); *United States v. Delk,* 586 F.2d 513, 518 (5th Cir.1978).

▮ As a preliminary matter the court notes that the testimony of Offie Evans was hardly favorable to petitioner. Most of the testimony was highly damaging to petitioner. The only part of the testimony which could even remotely be regarded as favorable was Evans' testimony that McCleskey had told him that his face had been made up on the morning of the robbery by Mary Jenkins. This testimony contradicted Mary Jenkins' earlier testimony and thus had impeachment value against one of the State's witnesses. However, the very testimony that would have been impeached was testimony favorable to petitioner. Jenkins' testimony that petitioner had clear skin and no scar on the day of the crime contradicted the testimony of the store employees that the person in the front of the store had a rough, pimply complexion and a scar. Thus, Jenkins' testimony regarding petitioner's complexion on the morning of the crime helped create doubt in his favor. Impeachment of that testimony would have hurt rather than helped petitioner.

As a secondary matter, the court cannot see that the evidence in question was suppressed by the prosecution. While it was not produced prior to trial, it was produced during the trial. Thus, the jury was able to consider it in its deliberations. Petitioner has produced no cases to support the propositon that the failure of the prosecution to produce evidence prior to trial entitles him to a new trial where that evidence was produced during the trial. Since the evidence was before the jury, the court cannot find that the failure to disclose it prior to trial deprived petitioner of due

process. Petitioner's Claim "Q" is clearly without merit.

## XV. CLAIM "R"—SUFFICIENCY OF THE EVIDENCE.

By this claim petitioner contends that the evidence introduced at trial was insufficient to prove beyond a reasonable doubt that he was the triggerman who shot Officer Schlatt and that the shooting constituted malice murder. Petitioner does not argue that the evidence was insufficient to support his conviction for armed robbery.

▮ As part of its review in this case, the Supreme Court found that "the evidence factually substantiates and supports the finding of the aggravating circumstances, the finding of guilt, and the sentence of death by a rational trier of fact beyond a reasonable doubt." *McClesky v. State,* 245 Ga. 108, 115, 263 S.E.2d 146 (1980). In reviewing the sufficiency of the evidence, this court must view the evidence in a light most favorable to the State and should sustain the jury's verdict unless it finds that no rational trier of fact could find the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Much of the evidence against petitioner was circumstantial. Witnesses placed him in the front of the store carrying a nickel-plated revolver matching the description of a .38 caliber Rossi which petitioner had stolen in an earlier armed robbery. The State's ballistics expert testified that the bullet which killed Officer Schlatt was probably fired from a .38 caliber Rossi. At least one witness testified that the shots were fired from a point closer to the front of the store than she was lying.

▮ While the circumstantial evidence alone may not have been sufficient to support a verdict of malice murder, the State also introduced highly damaging testimony by one of the co-defendants, Ben Wright, and a fellow inmate at the Fulton County Jail, Offie Evans. Both of these witnesses testified that petitioner had admitted shooting Officer Schlatt. Evans testified that

McCleskey told him that he would have shot his way out of the store even if there had been a dozen police officers. It is not this court's function to weigh the credibility of this testimony. That was for the jury to do. Viewing all the evidence in a light most favorable to the State, this court cannot find that no rational trier of fact could find petitioner guilty beyond a reasonable doubt of malice murder. *Jackson v. Virginia, supra.* Petitioner's Claim "R" is therefore without merit.

### XVI. CLAIM "P"—INEFFECTIVE ASSISTANCE OF COUNSEL.

By this claim petitioner contends that he was denied effective assistance of counsel in contravention of the Sixth and Fourteenth Amendments. He alleges that his counsel was ineffective for the following reasons: (1) That his attorney failed to investigate adequately the State's evidence and possible defenses prior to trial; (2) that during the trial counsel failed to raise certain objections or make certain motions; (3) that prior to the sentencing phase of petitioner's trial counsel failed to undertake an independent investigation into possible mitigating evidence and thus was unable to offer any mitigating evidence to the jury; and (4) that after the trial, counsel failed to review and correct the judge's sentence report.

It is well established in this circuit that a criminal defendant is entitled to effective assistance of counsel—that is, "counsel reasonably likely to render and rendering reasonably effective assistance." *See, e.g., Washington v. Strickland,* 693 F.2d 1243, 1250 (5th Cir. Unit B, 1982) (en banc), *cert. granted,* —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983); *Gaines v. Hopper,* 575 F.2d 1147, 1149 (5th Cir. 1978); *Herring v. Estelle,* 491 F.2d 125, 127 (5th Cir.1974); *MacKenna v. Ellis,* 280 F.2d 592, 599 (5th Cir.1960), *cert. denied,* 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961). However, the Constitution does not guarantee errorless counsel or counsel judged ineffective only by hindsight. *Herring v. Estelle, supra.* In order to be

entitled to habeas corpus relief on a claim of ineffective assistance of counsel, petitioner must establish by a preponderance of the evidence: (1) That based upon the totality of circumstances in the entire record his counsel was not "reasonably likely to render" and in fact did not render "reasonably effective assistance," and (2) that "ineffectiveness of counsel resulted in actual and substantial disadvantage to the course of his defense." *Washington v. Strickland,* 693 F.2d 1243, 1262 (5th Cir. Unit B 1982) (en banc). Even if petitioner meets this burden, habeas corpus relief may still be denied if the State can prove that "in the context of all the evidence ... it remains certain beyond a reasonable doubt that the outcome of the proceedings would not have been altered but for the ineffectiveness of counsel." *Id.* With these standards in mind the court now addresses petitioner's particular contentions.

#### A. *Pretrial Investigation.*

It is beyond dispute that effective assistance of counsel requires some degree of pretrial investigation. "Informed evaluation of potential defenses to criminal charges and meaningful discussion with one's client of the realities of his case are cornerstones of effective assistance of counsel." *Gaines v. Hopper,* 575 F.2d 1147, 1149–50 (5th Cir.1978). In *Washington v. Strickland,* 693 F.2d 1243 (5th Cir. Unit B 1982) (en banc), the court discussed the extent of pretrial investigation required to constitute effective assistance of counsel. In that case the court stated:

> The amount of pretrial investigation that is reasonable defies precise measurement. It will necessarily depend upon a variety of factors including the number of issues in the case, relative complexity of those issues, the strength of the government's case, and the overall strategy of trial counsel.... In making that determination, courts should not judge the reasonableness of counsel's efforts from the omniscient perspective of hindsight, but rather "from the perspective of counsel, taking into account all of the circumstances of the case, but only as

those circumstances were known to him at the time in question." *Id.* at 1251 (quoting *Washington v. Watkins,* 655 F.2d 1346 at 1356 [5th Cir. Unit A 1981]).

The court went on to analyze a variety of cases falling into five general categories.[34] The category of cases identified by the *Washington* court which most closely resembles the present case was the one in which "counsel fails to conduct a substantial investigation into one plausible line of defense because of his reasonable strategic choice to rely upon another plausible line of defense at trial." In analyzing these cases the court stated:

> As observed above, when effective counsel would discern several plausible lines of defense he should ideally perform a substantial investigation into each line before making a strategic decision as to which lines he will employ at trial. In this ideal, as expressed in the American Bar Association's Standards, is an aspiration to which all defense counsel should strive. It does not, however, represent the constitutional minimum for reasonably effective assistance of counsel.... Realistically, given the finite resources of time and money that are available to defense counsel, fewer than all plausible lines of defense will be the subject of substantial investigation. Often, counsel will make a choice of trial strategy relatively early in the representation process after conferring with his client, reviewing the State's evidence, and bringing to bear his experience and professional judgment. Thereafter, he will constitute his finite resources on investigating

those lines of defense upon which he has chosen to rely.

> The choice by counsel to rely upon certain lines of defense to the exclusion of others before investigating all such lines is a strategic choice. ....

> A strategy chosen without the benefit of a reasonably substantial investigation into all plausible lines of defense is generally based upon counsel's professional assumptions regarding the prospects for success offered by the various lines. The cases generally conform to a workable and sensible rule: When counsel's assumptions are reasonable, given the totality of the circumstances and when counsel's strategy represents a reasonable choice based upon those assumptions, counsel need not investigate lines of defense that he has chosen not to employ at trial. 693 F.2d at 1254–55.

 In the present case petitioner's trial counsel was faced with two plausible lines of defense—an alibi defense or a defense that petitioner participated in the robbery but was not the triggerman who killed Officer Schlatt. Pursuing the second defense would almost have guaranteed a conviction for armed robbery and felony murder, for which petitioner could still have received the death penalty or at least life imprisonment.[35] On the other hand, a successful alibi defense offered the prospect of no punishment at all. Trial counsel testified at the state habeas corpus hearing that McCleskey had repeatedly insisted that he was not present at the crime. Trial counsel also testified that after the preliminary hearing he and McCleskey reasonably

---

**34.** The five categories of cases dealing with claims of ineffective assistance of counsel in the pretrial investigation were: (1) counsel fails to conduct substantial investigation into the one plausible line of defense in the case; (2) counsel conducts a reasonably substantial investigation into the one line of defense that is presented at trial; (3) counsel conducts a reasonably substantial investigation into all plausible lines of defense and chooses to rely upon fewer than all of them at trial; (4) counsel fails to conduct a substantial investigation into one plausible line of defense because of his reasonable strategic choice to rely upon another plausible line of defense at trial; and (5) counsel fails to conduct

a substantial investigation into plausible lines of defense for reasons other than strategic choice.

**35.** Under Georgia law applicable at the time of petitioner's trial, petitioner, as a party to the crime of armed robbery, would have been subject to the same penalty for the death of Officer Schlatt irrespective of whether he actually pulled the trigger. *See* Ga.Code Ann. § 26–801 (now codified at O.C.G.A. § 16–2–21). Under Georgia law at the time both murder and felony murder were punishable by death or life imprisonment. Ga.Code Ann. § 26–1101 (now codified at O.C.G.A. § 16–5–1).

believed that an alibi defense could be successful. A primary reason for this belief was that Mamie Thomas, one of the Dixie Furniture Mart employees who was up front when the robber came in and had an opportunity to observe him, was unable to identify McCleskey at the preliminary hearing, despite the fact that she was standing only a few feet from him. Given the contradictory descriptions given by the witnesses at the store, the inability of Mamie Thomas to identify petitioner, and petitioner's repeated statements that he was not present at the scene, and the possible outcome of pursuing the only other defense available, the court cannot say that trial counsel's decision to pursue the alibi defense was unreasonable or constituted ineffective assistance of counsel.

■ Having made a reasonable strategic choice to pursue an alibi defense, trial counsel could reasonably have decided not to interview all of the store employees. None of the statements produced by petitioner indicates that these employees would have contradicted the State's theory of the case. At best, they might have cumulatively created a reasonable doubt as to whether petitioner was the triggerman. This, however, was a defense counsel and petitioner had chosen not to pursue. Counsel had read their statements and concluded that none of these employees could identify McCleskey as the gunman who entered the front of the store. He also had the sworn testimony of at least one witness that McCleskey was definitely not the person who entered the front of the store. Under such circumstances the failure to interview the store employees was reasonable. *See Washington v. Watkins*, 655 F.2d 1346 (5th Cir. Unit A 1981), *cert. denied*, 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982) (failure to interview in person the only eye

witness to an armed robbery and murder not ineffective assistance of counsel where client was asserting an alibi defense and telephone interview had established that witness could not identify or describe the gunman).[36]

■ Slightly more troubling than the failure to interview the witnesses at the store was counsel's failure to interview the sheriff's deputies and Offie Evans prior to trial. Evans' testimony was certainly very damaging to petitioner, and a pretrial investigation as to what his testimony would be may have uncovered the details of his escape from a halfway house and the pending federal charges against him, his "understanding" with an Atlanta police detective, his history of drug use, and his imaginative story that he had gone to Florida and participated in an undercover drug investigation during his escape. Discovery of such evidence would have had substantial impeachment value. However, this court cannot find on the facts before it that counsel acted unreasonably in failing to interview Evans prior to trial. Although he recognized that at least one of the names in the prosecution's witness list was a Fulton County Sheriff's Deputy and suspected that a jailhouse confession might be forthcoming, counsel testified that McCleskey told him that he had made absolutely no incriminating statements to anyone in the Fulton County Jail. There has been no allegation that petitioner was incompetent or insane at any time during this proceeding. It would be anomalous, then, for this court to grant petitioner habeas corpus relief on the grounds that petitioner's counsel was ineffective because he did not disbelieve petitioner and undertake an independent investigation.

■ Finally, petitioner contends that his counsel was ineffective because he

---

**36.** Although Mamie Thomas recanted her testimony immediately after the preliminary hearing, telling one of the detectives that she had lied because she was scared, and a later interview with her may have disclosed the change of testimony, this court cannot hold as a matter of law that counsel has a duty to disbelieve sworn testimony of a witness favorable to his client.

In other words, counsel could reasonably believe that the witness's testimony at trial would be substantially the same as it was at the preliminary hearing. When it turned out to be different, counsel took the proper step of impeaching her later testimony with her testimony at the preliminary hearing.

failed to interview the State's ballistics expert, Kelly Fite. However, a similar claim was rejected on similar facts in *Washington v. Watkins*, 655 F.2d at 1358. Petitioner's counsel had read the expert's report and was prepared adequately to cross-examine the expert at trial. The court does not believe, therefore, that the failure to interview the witness in person prior to trial constituted ineffective assistance of counsel.

### B. *Performance During the Trial: Guilt/Innocence Phase.*

 Petitioner also contends that counsel's conduct of the trial was deficient in several respects. First, petitioner contends that the failure to move for a continuance or a mistrial when he learned of the suggestive line-up procedure on the morning of the trial constituted ineffective assistance. However, the court has already concluded in Part X, *supra*, that there was nothing unconstitutional about the chance viewing of the defendants prior to trial. The viewing therefore would not have been grounds for a mistrial or a continuance. Failure to make a motion unwarranted in law is not ineffective assistance of counsel.

 Petitioner also contends that his counsel failed to object to admission of evidence regarding prior convictions and sentences for armed robbery. Petitioner makes the somewhat technical argument that because these convictions had been set aside by the granting of a motion for a new trial that they were inadmissible. Petitioner further contends that counsel did not object to this evidence because he had failed to investigate the circumstances of these convictions prior to. trial.[37] Assuming for the moment that the failure to investigate these convictions constituted ineffective assistance of counsel, the court is unconvinced that petitioner can show actual and substantial prejudice resulted from the ineffectiveness. *See Washington v.*

*Strickland*, 693 F.2d 1243, 1262 (5th Cir. Unit B 1982) (en banc) *cert. granted*, —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983). First, petitioner does not contend that he was not guilty of those crimes. In fact, after being granted a new trial he pleaded guilty to them and received an 18-year sentence. The court has already held that under Georgia law those crimes were admissible to show that petitioner engaged in a pattern or practice of armed robberies. The court cannot say that counsel's failure to object to the introduction of this evidence at the guilt stage caused petitioner actual and substantial prejudice. Also, while the jury did learn that petitioner had received life sentences which had subsequently been set aside and this fact may have prejudiced them at the penalty stage of petitioner's trial,[38] the court is unprepared to say that in the context of all of the evidence, the failure of counsel to object to the introduction of this evidence warrants petitioner a new trial. However, given the court's holding in Part III, *supra*, this point is essentially moot.

 Finally, petitioner contends that trial counsel was ineffective because he failed to object to the trial court's "overly broad instructions to the jury (1) with regard to presumptions of intent and (2) as to the use of 'other acts' evidence for proof of intent, and (3) as aggravating circumstances at the sentencing phase." Petitioner's September 20, 1983 Memorandum of Law in Support of Issuance of the Writ at 64. This court has already found that the trial court's instructions were not erroneous or overbroad. *See* Parts IV, VII and VIII, *supra*. Failure to object to the instructions was not, therefore, ineffective assistance of counsel.

### C. *Ineffective Assistance at Trial— Sentencing Phase.*

 Petitioner has contended that trial counsel was ineffective because he failed to

---

**37.** Pursuant to Ga.Code Ann. § 27–2503(a) the State informed trial counsel on October 2, 1978 that it intended to offer in aggravation certain prior convictions and sentences of petitioner.

The convictions and sentences which petitioner contends were invalid were among those listed.

**38.** See note 26, *supra*.

undertake an independent investigation to discover and produce mitigating evidence and witnesses to testify on behalf of petitioner at the sentencing phase of his trial. Trial counsel testified that he asked petitioner for names of persons who would be willing to testify for him and that petitioner was unable to produce a single name. Counsel also testified that he contacted petitioner's sister and that she also was unable to produce any names.[39] A review of trial counsel's testimony at the state habeas hearing convinces this court that counsel made a reasonable effort to uncover mitigating evidence but could find none. Petitioner's sister declined to testify on her brother's behalf and told counsel that petitioner's mother was unable to testify because of illness. *McCleskey v. Zant*, H.C. No. 4909, Slip Op. at 19 (Sup.Ct. of Butts County, April 8, 1981). The record simply does not support a finding of actual and substantial prejudice to petitioner due to any ineffective assistance by petitioner's counsel at the sentencing phase of the trial.

### D. *Ineffective Assistance—Post-Trial.*

■ Petitioner contends that trial counsel was also ineffective in failing to correct inaccuracies and omissions in the trial judge's post-trial sentencing report.[40] This report is used by the Georgia Supreme Court as part of its review of whether the sentence imposed was arbitrary, excessive, or disproportionate.[41] While it was in part because the Georgia capital sentencing procedure provided such a review that the

Supreme Court upheld the Georgia death penalty in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Supreme Court has recently declared that such proportionality reviews are not required by the Constitution. *Pulley v. Harris*, —— U.S. —— at —— - ——, 104 S.Ct. 871 at 876–881, 79 L.Ed.2d 29 (1984). Since proportionality reviews are not required by the Constitution, it is difficult for this court to see actual and substantial prejudice caused to petitioner by counsel's failure to review and correct mistakes in the trial judge's report, even if such failure would constitute ineffective assistance of counsel.

Since the court has concluded that petitioner has been unable to show actual and substantial prejudice caused by any ineffective assistance of counsel, petitioner's Claim "P" is without merit.

## XVII. CONCLUSION

For the reasons set forth in Part III, *supra*, it is ORDERED, ADJUDGED, and DECREED that petitioner's conviction for malice murder be set aside and that petitioner within one hundred twenty (120) days after this judgment becomes final as a result of the failure of respondent to lodge an appeal or as the result of the issuance of a mandate affirming this decision, whichever is later, be reindicted and tried, failing which this writ of habeas corpus without further order shall be made absolute.

---

**39.** The sister testified at the state habeas hearing that counsel never asked her for any names and that if he had done so she would have been ready, willing and able to produce a number of names. The habeas court specifically chose to credit the testimony of the trial counsel rather than the sister. *See McCleskey v. Zant*, H.C. No. 4909, Slip Op. at 19 (Sup.Ct. of Butts County, April 8, 1981). This finding of fact is presumed to be correct. 28 U.S.C. § 2254(d).

**40.** Georgia's capital sentencing procedure provides for the filing of a trial judge's report to be part of the record reviewed by the Georgia Supreme Court on appeal. O.C.G.A. § 17–10–35.

**41.** For a discussion of proportionality analysis in Eighth Amendment jurisprudence see Comment *"Down the Road Toward Human Decency": Eighth Amendment Proportionality Analysis and* Solem vs. Helm, 18 Ga.L.Rev. 109 (1983).